IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES, LLC, et al.,[1]<br><br>Remaining Debtors. | Chapter 11<br><br>Case No. 17-12560 (JKS)<br><br>(Jointly Administered) |
| MICHAEL GOLDBERG, in his capacity as Liquidating Trustee of the Woodbridge Liquidation Trust,<br><br>Plaintiff,<br><br>vs.<br><br>KENNETH HALBERT,<br><br>Defendant. | Adversary Proceeding<br>No. 19-51027 (JKS) |

## PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

By and through his undersigned counsel, Michael Goldberg, in his capacity as liquidating trustee (the "Trustee" or "Plaintiff") of the Woodbridge Liquidation Trust (the "Trust"),[2] plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), hereby moves for leave to file the proposed amended complaint (the "Amended Complaint") attached hereto as Exhibit 1. In support of this Motion, Plaintiff respectfully submits as follows:

---

[1] The Remaining Debtors and the last four digits of their respective federal tax identification numbers are as follows: Woodbridge Group of Companies, LLC (3603) and Woodbridge Mortgage Investment Fund 1, LLC (0172). The Remaining Debtors' mailing address is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423.

[2] The Trust was formed pursuant to Woodbridge Group of Companies, LLC and its affiliated debtors' (the "Debtors" or "Woodbridge") *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and its Affiliated Debtors* (the "Plan"), confirmed by the United States Bankruptcy Court for the District of Delaware (this "Court") on October 26, 2018 in jointly administered case number 17-12560 (the "Bankruptcy Cases") and effectuated on February 15, 2019.

# I. PRELIMINARY STATEMENT

1. This is a "net winner" Adversary Proceeding arising out of the billion-dollar Ponzi scheme orchestrated by Robert Shapiro, the Debtors' founder, in which Shapiro utilized the Debtors to raise over one billion dollars from approximately 10,000 investors nationwide. The scheme's collapse in late 2017 resulted in massive losses to thousands of innocent investors who unwittingly became victims of the scheme, and led to these bankruptcy cases and the creation of the Trust, which is tasked with monetizing estate assets and distributing funds to these "net losers" (*i.e.*, the vast majority of Woodbridge investors who lost more than they ever put in to the scheme). This is one of multiple lawsuits the Trustee filed to recover payments made to "net winners" who were fortunate enough to cash out of the scheme prior to its collapse – that is, they received more money back from the scheme than they "invested."

2. The law is clear in the Ponzi scheme context that net winners are liable to return the fictitious "profits" they made, as these profits are in actuality just funds stolen from other victims – that is the nature of a Ponzi scheme.[3] But when a Ponzi scheme like Woodbridge returns amounts up to the amount the investor put in (*i.e.*, invested "principal"), such transfers are **commonly** not avoidable because the return of invested funds usually falls within the good faith affirmative defense of Bankruptcy Code section 548(c).[4] "Good faith" in this context means that the defendant did not know and had no reason to know that Woodbridge was a fraudulent scheme.[5] Importantly, the Trustee could have sued each and every net winner for the

---

[3] *See generally Donell v. Kowell*, 533 F.3d 762, 773 (9th Cir. 2008) (explaining the concept under the Uniform Fraudulent Transfer Act, which is equivalent in this respect to the Bankruptcy Code's fraudulent transfer provisions).

[4] *See id.* at 771 (plaintiff seeking avoidance "may only recover 'profits' above the initial outlay, unless [there is] a lack of good faith, in which case the [plaintiff] may *also* recover the amounts that could be considered return of principal" (emphasis in original)).

[5] *See In re Agricultural Res. & Tech. Grp., Inc.*, 916 F.2d 528, 535 (9th Cir. 1990) (quoting *Shauer v. Alterton*, 151 U.S. 607, 621 (1894), for the proposition that the defendant's "knowledge or actual notice of circumstances

full amount of the transfers they received, and required each to then plead and prove that he or she was entitled to the good faith affirmative defense of section 548(c) and thus only liable to return profits, not principal. Doing so, however, would have placed an unwarranted burden on the vast majority of net winner defendants, who are entitled to the good faith affirmative defense and thus should only be required to return amounts in excess of invested principal.

3. This is a rare adversary proceeding in which the Trustee has uncovered evidence that the defendant, net winner Kenneth Halbert ("Halbert"), is not entitled to the good faith affirmative defense. During the course of litigating this Adversary Proceeding, the Trustee has recently learned that, unlike the typical Woodbridge investor, Halbert had a close personal and business relationship with Shapiro. The Trustee has uncovered emails in which Shapiro refers to Halbert as his "good friend," and in which Shapiro offers his vacation home, rent-free, to Halbert's son. In addition, numerous other emails evidence that Halbert had an always-open line of communication with Shapiro regarding business matters.

4. The Trustee has uncovered evidence that, likely due to this close relationship, Halbert was personally aware of numerous troubling facts concerning the Debtors and Shapiro. Most critically, it appears that Halbert was aware of the central lie of the Ponzi scheme: Shapiro's false representation to investors that the real estate at issue (such as the Owlwood Estate) was owned by bona fide third-party borrowers, when in fact it was owned by disguised Woodbridge affiliates. Critically, Halbert transacted directly with the owner of the Owlwood, on whose behalf Robert Shapiro signed as "Manager," and Halbert's son entered into an agreement with that entity to receive a "finder's fee" in connection with any sale of the Owlwood to a real third party. These facts are irreconcilable with the false promise that Owlwood was *already*

---

sufficient to put him, as a prudent man, upon inquiry as to whether his brother intended to delay or defraud his creditors" is inconsistent with "good faith").

owned by a third party and that Woodbridge was merely that third party's lender. To the Trustee's knowledge, no other investor was privy to this information.

5. There are multiple other indicia that Halbert is unlike innocent investors who were taken in by Shapiro's scheme, including that:

- Woodbridge gave Halbert bespoke loan documentation that differed from the standard documents provided to every other investor of which the Trustee is aware, with certain of Halbert's loans – and only Halbert's loans – tied directly with a property-owning entity, and certain of Halbert's liens – and only Halbert's liens – apparently being directly on a real property (specifically the Debtors' crown jewel property, Owlwood).

- Woodbridge gave Halbert better terms than it gave to essentially every other investor, including payment to Halbert of loan origination fees and at least one instance in which Shapiro told Halbert that he would get a "special price."

- Unlike the returns paid to essentially every other investor, the payments that Halbert received from Woodbridge were largely from entities *other than* the entities named on Halbert's signed documentation – once again, key facts to which innocent investors were never privy.

6. At a bare minimum, this knowledge should have prompted Halbert to investigate further or to stop investing in Woodbridge. Instead, it apparently led him to negotiate unique protections and leverage available to no one else, which is certainly inconsistent with "good faith." This apparent lack of good faith fundamentally changes the calculus of this Adversary Proceeding, and the Trustee respectfully requests leave to amend in order to seek return both of "interest" and alleged "principal."

7.       Leave is manifestly appropriate here. The Adversary Proceeding remains in its early stages and the proposed amended claims involve precisely the same transactions and investments as the existing claims. Granting this motion will not substantively prejudice Halbert; it merely allows the Trustee to make ***allegations*** against which Halbert will have a full and fair opportunity to defend. If Halbert is indeed entitled to the affirmative defense of section 548(c) as to some or all of the principal-repayment transfers, then he will be able to retain those transfers. By contrast, denying leave to amend will send the message to every future trustee in every Ponzi scheme bankruptcy case that every initial complaint against every net winner should seek to recover principal payments, just in case the trustee learns later that one of those net winners may not be entitled to the good faith affirmative defense. That is not the "justice" that Rule 15 "requires." Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").

## II. FACTUAL BACKGROUND

8.       On December 4, 2017 (the "Petition Date"), many of the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code. Certain other Debtors filed voluntary cases on several dates in February and March 2018.

9.       The Bankruptcy Court confirmed the Plan on October 26, 2018, and the Plan became effective on February 15, 2019 (the "Effective Date"). The Plan provides, among other things, for the creation of the Trust for the benefit of the Trust's beneficiaries. On the Effective Date, the Trust was automatically vested with the right and power to file and pursue any and all "Liquidation Trust Actions." *Id.* § 5.4.15. "Liquidation Trust Actions" include, *inter alia*, "all Avoidance Actions and Causes of Action held by the Debtors or their Estates . . . ." *Id.* § 1.76.

10.      Halbert was a private lender who made short-term loans to Woodbridge in accordance with the terms of loan documentation executed by Halbert and one or more

Woodbridge entities. In connection with these loans, Halbert was purportedly given certain security interests, including a lien on Woodbridge's flagship property at 141 S. Carolwood Drive in Los Angeles, California – also known as the Owlwood Estate. Jeremiassen Decl. at ¶ 6, 7, Exs. A, B.

11. The Trust owns and maintains the Debtors' books and records, which include the ledger of transfers made to and from Halbert. *Id.* at ¶ 4, 5. That ledger (the "Halbert Ledger") is attached to the Amended Complaint as Exhibit 1. *Id.* at ¶ 5. The Halbert Ledger evidences that, in addition to the receipt of periodic interest payments, Halbert also received periodic principal payments, which were largely contemporaneous with, and, in fact, part of the same transaction as, the corresponding interest payments. For example, the Halbert Ledger shows the following series of payments in December 2013:

| Date | Name | Description | Amount |
|---|---|---|---|
| 12/16/13 | KENNETH HALBERT | 400K BL PAYDOWN+ INT | 100,000.00 |
| 12/16/13 | KENNETH HALBERT | 400K BL PAYDOWN+ INT | 448.00 |
| 12/17/13 | KENNETH HALBERT | 700K BL PAYDOWN+ INT | 100,000.00 |
| 12/17/13 | KENNETH HALBERT | 700K BL PAYDOWN+ INT | 560.00 |
| 12/19/13 | KENNETH HALBERT | 1M BL PAYDOWN+ INT | 100,000.00 |
| 12/19/13 | KENNETH HALBERT | 1M BL PAYDOWN+ INT | 600.00 |
| 12/20/13 | KENNETH HALBERT | 1M BL PAYDOWN + INT | 100,000.00 |
| 12/20/13 | KENNETH HALBERT | 1M BL PAYDOWN + INT | 657.00 |

12. In addition, the Halbert Ledger indicates, with respect to each transfer, the specific Woodbridge entity that made or received such transfer. Halbert's investments in the Debtors were almost exclusively transferred to either Woodbridge Mortgage Investment Fund 1, LLC, or Woodbridge Mortgage Investment Fund 2, LLC (among others, the "Fund Debtors") – just like the investments made by every other investor, and a small number of investments were paid directly to Woodbridge Structured Funding, LLC ("WSF"). But Halbert's principal and interest payments came exclusively from WSF and Woodbridge Group of Companies, LLC ("WGC") – a bright red flag that all was not as Shapiro was representing to others.

13. The Trustee filed the original complaint [Adv. Docket No. 1] (the "Original Complaint") on December 1, 2019. The Original Complaint seeks to avoid, as both actual-intent and constructive fraudulent transfers pursuant to federal and state law, the transfers made by the Debtors to Halbert in excess of the amount of his principal investment (in other words, his fictitious profits). Halbert answered the Original Complaint on January 15, 2020 [Adv. Docket No. 4].

14. On October 27, 2020, the Trustee and Halbert signed a *Stipulation Regarding Appointment of Mediator* [Adv. Docket No. 26], appointing Ian Connor Bifferato, Esq. to serve as mediator in the Adversary Proceeding. The mediation has not resulted in a settlement. Discovery has not commenced in the Adversary Proceeding, and no motion practice has taken place prior to the filing of this Motion.

15. The Trustee has recently uncovered emails in which Shapiro refers to Halbert as his "good friend," and in which Shapiro offers his vacation home, rent-free, to Halbert's son. Jeremiassen Decl., ¶ 8, 9, Exs. C & D. In addition, numerous other emails evidence that Halbert had an always-open line of communication with Shapiro regarding business matters. *Id.* at ¶ 10, 11, Exs. E, F, & G.

16. As a result of this personal relationship, Halbert was likely aware of numerous troubling facts concerning the Debtors and Shapiro. Most critically, it appears that Halbert knew or, at a minimum, should have known that there was no truth to Shapiro's representation to investors that the real estate (such as Owlwood) underlying Woodbridge's loans was owned by bona fide third-party borrowers rather than by disguised Woodbridge affiliates. Unlike the typical Woodbridge investor, Halbert transacted directly with the owner of Owlwood, on whose behalf Robert Shapiro signed as "Manager." Jeremiassen Decl., ¶ 6, 7, Exs. A & B. In addition,

Halbert's son entered into an agreement with that entity to receive a "finder's fee" in connection with any sale of Owlwood Estate. Jeremiassen Decl., ¶ 12, Ex. H. Further, Woodbridge gave Halbert bespoke loan documentation that differed from the documents that Woodbridge provide to other investors, with certain of Halbert's loans (and only Halbert's loans, to the Trustee's knowledge) tied directly with a property-owning entity, and certain of Halbert's liens (and only Halbert's liens, to the Trustee's knowledge) apparently being directly on Owlwood. Jeremiassen Decl., ¶ 6, 7, Ex. A &B.

17. In short, the Trustee now has good reason to believe – and ample grounds to plead in the proposed Amended Complaint – that Halbert is fundamentally differently situated than the thousands of innocent investors who lost their life savings in the Woodbridge Ponzi scheme, and thus, is not entitled to a "good faith" affirmative defense. The absence of such a defense means that the Trustee can and should avoid and recover not only the profit component of the transfers made to Halbert, but also the principal component of those payments.[6]

### III. ARGUMENT

**A.   Rule 15(a)'s Liberal Test for Amendment is Easily Satisfied Here**

18. Rule 15 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7015 of the Federal Rules of Bankruptcy Procedure, requires that leave to amend be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). Because federal policy strongly favors the adjudication of cases on their merits, leave to amend should be granted unless the opposing party demonstrates undue prejudice, bad faith, or dilatory motive, or amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Glob. Link Liquidating Trust v. Avantel, S.A. (In re Glob. Link Telecom Corp.)*, 327 B.R. 711, 718 (Bankr. D. Del. 2005).

---

[6] The Amended Complaint also includes an adjustment to the total amount of "net winning" transfers (which transfers were already pleaded in the Original Complaint) received by Halbert in light of further refinement by the Trustee of the transfers to and from Halbert.

"The policy of the [F]ederal [R]ules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading." *In re LG.Phillips Displays USA, Inc.*, 395 B.R. 864, 868 (Bankr. D. Del. 2008).

19. Here, justice plainly requires amendment. The evidence suggests that Halbert was aware of numerous facts that should have clued him in to Shapiro's fraud. Facing those facts, Halbert not only failed to disengage from the scheme, but continued to participate in – and profit from – it at the expense of thousands of innocent victims who unquestionably proceeded in good faith. Justice does not require that those victims lose the opportunity to recover legally avoidable transfers just because the Trustee made the sensible and appropriate initial choice to assume that all of the net winners were acting in good faith and should not be subjected to an initial complaint seeking recovery of both interest and principal when in all likelihood they had an iron-clad affirmative defense that would shield the repayment of invested principal.

20. "Third Circuit courts have extrapolated five instances in which a court may deny leave to amend a complaint: (1) if delay in seeking amendment is undue; (2) if delay in seeking amendment is prejudicial to the opposing party; (3) if delay in seeking amendment is motivated by bad faith; (4) if the amendment is futile in that it fails to state a claim for which relief can be granted; or (5) if the movant does not provide a drafted amended complaint." *In re Mortg. Lenders Network, USA, Inc.*, 395 B.R. 871, 876 (Bankr. D. Del. 2008) (citing *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272-73 (3d Cir. 2001)). Here, justice requires that leave to amend be granted in this case, and none of the aforementioned five instances that would warrant denial is present.

21. The Third Circuit has interpreted "prejudice to the non-moving party [as] the touchstone for the denial of an amendment." *Lorenz*, 1 F.3d at 1413–14. A "mere claim of prejudice is not sufficient; there must be some showing that [the defendant] was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the ... amendments been timely." *Dole v. Arco. Chem. Co.*, 921 F.2d 484, 488 (3d Cir. 1990). "The amount of prejudice needed to justify the denial of leave to amend is significant; it must be 'substantial or undue.'" *In re Fleming Cos.*, 323 B.R. 144, 148 (Bankr. D. Del. 2005) (quoting *Cureton*, 242 F.3d at 273). "[I]nconvenience to a party or the strengthening of the movant's legal position does not provide sufficient prejudice." *Id.* The prejudice inquiry "focuses on hardship to the defendant if the amendment were permitted, specifically, whether amendment would result in additional discovery, cost, and preparation to defend against new facts or new theories." *Se. Pa. Transp. Authority v. Orrstown Fin. Servs., Inc.*, 335 F.R.D. 54, 61 (M.D. Pa. 2020) (quoting *Cureton*, 252 F.3d at 273).

22. Here, amendment will cause no legal prejudice to Halbert because the Adversary Proceeding is in its very early stages and Halbert will still have a full and fair opportunity to attempt to establish the good faith affirmative defense. No new investments are implicated in the proposed amended complaint. Discovery has yet to begin. There has been no motion practice. Amendment will not require the retreading of any ground, as no ground has thus far been tread. Accordingly, Halbert cannot demonstrate that he would be unfairly prejudiced if leave to amend is granted. *See, e.g., Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 119 (4th Cir. 2013) (no undue prejudice would result from amendment because case was "many steps removed from trial"); *Tabon v. Univ. of Pa. Health Sys.*, 2012 U.S. Dist. LEXIS 101049, at *11-13 (E.D. Pa. July 20, 2012) (granting motion to amend complaint and reasoning that adding "a

'new' claim that involves a potentially greater damages award ... would not justify denial of amendment" because increased exposure to damages "is not 'prejudice' sufficient to justify denial of amendment").

23. Moreover, there has been no undue delay on the Trustee's part, as amendment is being sought promptly after the Trustee's discovery of the facts warranting amendment. "The mere passage of time does not require that a motion to amend a complaint be denied on grounds of delay. In fact, delay alone is an insufficient ground to deny leave to amend." *Cureton*, 252 F.3d at 273 (internal quotation marks and citations omitted). Courts in the Third Circuit have granted leave to leave to amend up to four years after the initial complaint was filed. *See, e.g., Tabon*, 2012 U.S. Dist. LEXIS 101049, at *6–7. The Trustee has attached a draft of the Amended Complaint, and has not acted in "bad faith" in seeking to file it.

24. The Amended Complaint would plainly not be futile. Futility only exists where the "amendment does not plead enough to make out a plausible claim for relief." *HSBC Realty Credit Corp. (USA) v. O' Neill*, 745 F.3d 564, 578 (1st Cir. 2014). Halbert did not challenge the sufficiency of the allegations in the Original Complaint, and the Trustee's affirmative case in the Amended Complaint to show that the principal payments were intentionally fraudulent is precisely the same as in the Original Complaint. Halbert's "good faith" is an affirmative defense that Halbert must plead and prove; the Trustee is not and never has been obliged to plead or prove the **absence** of good faith. *Bayou Superfund LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) ("The good faith / value defense provided in section 548(c) is an affirmative defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense.").

## B. The New Claims Relate Back to the Existing Claims Under Rule 15(c)

25. Federal Rule of Civil Procedure 15(c)(1)(B) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." The Third Circuit has explained that "[i]n essence, application of Rule 15(c) involves a search for a common core of operative facts in the two pleadings. As such, the court looks to whether the opposing party has had fair notice of the ***general fact situation*** and ***legal theory*** upon which the amending party proceeds." *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004) (emphasis added; citations omitted); *see also In re Gerardo Leasing*, 173 B.R. 379, 388 (Bankr. N.D. Ill. 1994) (reasoning that "the most important factor in determining whether to allow an amended complaint to relate back to the date of the original filing is whether the original complaint provided the defendant with sufficient notice of what must be defended against in the amended pleading").

26. Here, the claims to recover principal arise out of exactly the same conduct, transactions, and occurrences as the existing claims to recover interest. The principal payments to be recovered relate to precisely the same loans as the interest payments that form the entire subject of the Original Complaint, and thus all payments clearly "arise" out of the "same transaction." Halbert is, and has always been, on notice of the "general fact situation and legal theory" upon which the Trustee is proceeding. *Bensel*, 387 F.3d at 310. As one Circuit Court has explained:

> Limitation is suspended by the filing of a suit because the suit warns the defendant to collect and preserve his evidence in reference to it. When a suit is filed in a federal court under the Rules, the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be, and that the form of the action or the relief prayed or the law relied on will not be confined to their first statement.

*Martell v. Trilogy Ltd.*, 872 F.2d 322, 326 (9th Cir. 1989) (citing *Barthel v. Stamm*, 145 F.2d 487, 491 (5th Cir. 1944)). The Original Complaint contained *all* of the operative facts to which *all* of the Trustee's claims relate. Halbert was therefore fully and fairly on notice for all claims related to those facts, including payments of both principal and interest.[7]

\* \* \*

27. The Trustee filed his Original Complaint initially focusing on the interest/profit component of Halbert's transfers from the Debtors, just as the Trustee did in other net winner adversary proceedings. Doing so ensured that the vast majority of net winner defendants would not need to plead or prove a good faith affirmative defense. Halbert is a uniquely situated net winner for whom evidence has emerged that the good faith affirmative defense is not available. There is no injustice in requiring Halbert to plead and prove that affirmative defense. If Halbert is in fact entitled to the affirmative defense as to some or all transfers of principal, then he will prevail on the merits and will not have to return the transfers shielded thereby. But if he is not, then the innocent investors who did not have Halbert's insider connections, special access, and bespoke documentation should not be deprived of the additional recovery that Halbert justly owes.

28. In short, granting leave to amend prejudices no one, but denying leave to amend would prejudice thousands of innocent investors, and would send the message to every future trustee in a Ponzi scheme bankruptcy case that all net winner lawsuits should assume that every investor was "in" on the scheme unless and until those investors plead and prove otherwise. Justice does not so require.

---

[7] Indeed, in many instances, Halbert received payments of principal and interest together, and Woodbridge commonly made two journal entries on the same day with the same memorandum evidencing the principal and interest transfers.

## IV. CONCLUSION

WHEREFORE, the Trustee hereby request that the Court grant this Motion, permit the filing of the Amended Complaint in substantially the form attached hereto as Exhibit 1, and grant such other relief as may be necessary and appropriate.

Dated: July 12, 2021  
Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

/s/ Colin R. Robinson
Richard M. Pachulski (CA Bar No. 90073)
Andrew W. Caine (CA Bar No. 110345)
Bradford J. Sandler (DE Bar No. 4142)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-4100
Fax: 302-652-4400
Email: rpachulski@pszjlaw.com
acaine@pszjlaw.com
bsandler@pszjlaw.com
crobinson@pszjlaw.com

-and-

KTBS LAW LLP
*f/k/a Klee, Tuchin, Bogdanoff & Stern LLP*
Kenneth N. Klee (*pro hac vice*)
Michael L. Tuchin (*pro hac vice*)
David A. Fidler (*pro hac vice*)
Jonathan M. Weiss (*pro hac vice*)
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Tel: (310) 407-4000
Fax: (310) 407-9090

*Counsel for the Plaintiffs*