# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1]<br><br>                          Remaining Debtors. | Chapter 11<br><br>Case No. 17-12560 (JKS)<br><br>(Jointly Administered) |
| MICHAEL GOLDBERG, in his capacity as Liquidating Trustee of the Woodbridge Liquidation Trust,<br><br>                          Plaintiff,<br><br>                          vs.<br><br>KENNETH HALBERT,<br><br>                          Defendant. | Adversary Proceeding<br>No. 19-51027 (JKS)<br><br>**Re: Docket Nos. 53, 59** |

## PLAINTIFF'S REPLY IN FURTHER SUPPORT OF
## MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

Michael Goldberg, in his capacity as liquidating trustee (the "Trustee" or "Plaintiff") of the Woodbridge Liquidation Trust (the "Trust"), respectfully submits this reply in further support of his *Motion for Leave to File Amended Complaint* [Docket No. 53] (the "Motion" or "Motion to Amend") and in response to the *Opposition to Plaintiff's Motion for Leave to File Amended Complaint* [Docket No. 59] (the "Opposition") filed by Kenneth Halbert ("Halbert" or "Defendant").[2]

---

[1] The Remaining Debtors and the last four digits of their respective federal tax identification numbers are as follows: Woodbridge Group of Companies, LLC (3603) and Woodbridge Mortgage Investment Fund 1, LLC (0172). The Remaining Debtors' mailing address is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

## I. INTRODUCTION

1.	The ultimate question before the Court on the Trustee's Motion to Amend is this: In the context of a multi-year, multi-billion-dollar Ponzi scheme involving upwards of 10,000 swindled investors, must a liquidating trustee adopt a presumption that each and every "net winner" (that is, each victim who ultimately received more from the scheme than he or she put in) was not acting in good faith? The Trustee's decision not to make such an assumption – and to thereby spare hundreds of other net winner defendants an unwarranted burden – is the only reason that the Trustee now requires leave to amend.

2.	Halbert's Opposition does not dispute – and thus the parties are in agreement on, at least for purposes of the Motion to Amend – the following propositions:

- In Ponzi scheme cases, *all* net winners – regardless of fault, blame, standard of care, or any other circumstance – are liable to disgorge the fictitious "profits" they made (that is, the amounts they took out over and above what they put in) because those profits are actually just funds stolen from other victims. *See* Mot. ¶ 2 & nn.3–4 (discussing the case law in this regard, none of which is disputed or even addressed in the Opposition). Thus, an investor who put in $100 and got back $110 is liable to return $10, because that $10 was stolen from someone else.

- Fictitious profits are the only thing that the vast majority of net winners are liable to disgorge, because they have a good faith affirmative defense under section 548(c) and corresponding provisions of state law as to any claims concerning the principal they invested. *See id*. (same). Thus, the innocent investor who put in $100 and got back $110 need only disgorge $10 (rather than $110) because the investor has an affirmative defense as to the $100 in returned principal, which was received "for value and in good faith." 11 U.S.C. § 548(c).

2

- Because this good faith defense is an affirmative defense that a defendant must plead and prove, *see* Mot. ¶ 24 (again neither disputed nor addressed in the Opposition), the Trustee could have sued all net winner defendants (hundreds of people in total) for avoidance of all transfers they received from the Ponzi scheme, including even returned principal, and required each of them to plead and prove their good faith as an affirmative defense in order not to have to pay back returned principal.

- Rather than put hundreds of innocent people through that burden, the Trustee sued all net winners only for return of their fictitious profits. Throughout the course of litigating the net winner and other adversary proceedings, the Trustee has to date identified one – and only one – net winner defendant whose good faith is suspect. That defendant is Kenneth Halbert.

3. Nowhere does the Opposition dispute that the proposed Amended Complaint states a claim upon which relief can be granted as to every transfer on the Halbert Ledger attached thereto as Exhibit 1. Nor does the Opposition challenge the damning emails and materials attached to the Jeremiassen Declaration. There is no assertion, for example, that the "Kenneth Halbert" who was a "good friend" of the Ponzi scheme's mastermind, and whose son was offered a finder's fee in connection with the sale of the Owlwood Estate (thereby revealing the central lie of the Ponzi scheme – that properties such as Owlwood were supposed to already be owned by unaffiliated third parties), is a different "Kenneth Halbert" than Defendant. Indeed, the Opposition never takes issue with the central premise of the Motion: that Halbert is differently situated than the hundreds of other net winner defendants sued by the Trustee in that Halbert alone is uniquely suspect with respect to the good faith affirmative defense.

4. Rather than addressing any of the foregoing points, Halbert's Opposition to the Motion to Amend rests entirely on the passage of approximately 19 months between the filing of the Original Complaint in December 2019 and the filing of the Motion to Amend in July 2021. The Opposition incorrectly asserts that the Trustee "has provided no explanation" for why those 19 months elapsed, Opp'n ¶ 19, and emphasizes repeatedly that the information calling into question Halbert's good faith was in the Trustee's files all along, *see, e.g.*, *id.* ¶¶ 2, 4, 11, 19, 20, 21, 27 – and thus presumably should have prompted an earlier request to amend. The Opposition thus rests on the (unstated but essential) premise that the Trustee ought to have either presumed from the outset that Halbert was a bad actor or should have come to that conclusion much more quickly than he did given the damning evidence in the Trustee's possession.

5. The Opposition's delay argument fails. The parties agree that the Third Circuit's four-part inquiry as to whether "justice … requires" leave to amend (Fed. R. Civ. P. 15(a)(2)) does not turn on the mere passage of time. In fact, the Opposition even concedes that "delay alone is an insufficient ground to deny leave to amend …." Opp'n ¶ 18. The relevant question is whether there has been ***"undue"*** or ***"prejudicial"*** delay. *Compare* Mot. ¶ 20 *with* Opp'n ¶ 16 (citing the same general case law for the proposition that courts in the Third Circuit consider whether "the delay in seeking amendment is undue … [or] prejudicial to the opposing party"). Under the circumstances here – including the sole scheduling order entered in the Adversary Proceeding, which essentially stayed all litigation on consent of the parties – there has been no "undue" or "prejudicial" delay. Halbert is no worse off as a result of the Trustee's challenge to principal repayments having been made 19 months after the Original Complaint than Halbert would have been had that same challenge been made in the Original Complaint itself. Indeed, ***Halbert never argues otherwise***.

4

6. Beyond undue or prejudicial delay (entirely absent here), the only other asserted grounds for denying leave to amend are bad faith and futility. *See* Opp'n ¶ 16. Neither is present here. As to bad faith, the Opposition's attempts to impugn the Trustee's motivations for filing the Motion to Amend, *see id.* ¶¶ 26–27, are entirely without basis. This Adversary Proceeding has been litigated in the same manner as hundreds of other net winner adversary proceedings. The only difference is that the good faith of Defendant here, unlike the good faith of the defendants in those other matters, is uniquely suspect – a fact the Opposition never denies. Treating differently situated defendants differently is not "bad faith." Neither is proceeding with litigation when mediation is not successful.

7. Finally, the proposed amendment is not futile. No one disputes that the Amended Complaint states a claim upon which relief can be granted as to each and every transfer challenged therein, which is the well-accepted standard for defeating a claim of futility. *See* Mot. ¶ 24. Instead, the Opposition's futility argument is a bootstrapped no-relation-back argument under Rule 15(c). *See* Opp'n ¶¶ 28–38. That argument fails because the relation-back inquiry asks only whether a proposed amended complaint "asserts a claim … that arose out of the conduct, transaction, or occurrence set out" in the original complaint. Fed. R. Civ. P. 15(c)(1)(B). The Amended Complaint surely meets that standard. The Original Complaint sought to avoid transfers representing Halbert's profits. The Amended Complaint seeks to avoid those same transfers and also the repayment of the principal that generated those precise profits – subject, of course, to Halbert's right to plead and prove a good faith affirmative defense to shield any challenged principal repayment.[3] An amended complaint seeking to avoid repayment of the

---

[3] Halbert complains that the Trustee is trying to amend a $1 million claim into a $37 million claim. *See, e.g.*, Opp'n at 1–2 & ¶¶ 12, 23, 37. To be clear, the Trustee is seeking leave to amend so that the amounts at issue include all of the transfers – both profits and principal repayments – that Halbert received from the Ponzi scheme,

5

principal that produced certain profits self-evidently arises out of the same "conduct, transaction, or occurrence" as an original complaint to avoid repayment of those same profits, because principal and profits are inextricably intertwined – the latter is a consequence of the former. None of the case law cited in the Opposition is to the contrary.

## II.  ARGUMENT

**A.    There Has Been No Undue or Prejudicial Delay**

8.    With the exception of this Motion to Amend, there has been no motion practice whatsoever in the Adversary Proceeding.  Nor were there any initial disclosures under Rule 26(a), parties' planning meeting under Rule 26(f), or initial scheduling conference under Rule 16(b).  No document discovery has been requested or produced.  No depositions have been noticed or taken.  No written discovery has been served or answered.  No expert witnesses have been retained or identified, and no expert reports have been prepared.  No summary judgment motions have been filed, and certainly no trial preparations have begun.  In short, nothing of substance will need to be re-done because nothing of substance has yet been done in the first instance.  From a case management perspective, the 19 months that elapsed between the filing of the Original Complaint and the filing of the Motion to Amend is not functionally or practically different from 19 weeks or even 19 days.

---

which will mean only that the burden is then on Halbert to demonstrate his good faith as to each such transfer (consistent with section 548(c) and analogous state law).  To the extent that certain of the transfers were made at a time when Halbert can demonstrate that he neither knew nor should have known that Woodbridge was a Ponzi scheme, those transfers will fall within the affirmative defense and will not be avoidable.  That issue is not before the Court on the Motion to Amend; the only question now is whether the Trustee should be permitted to make the allegations in the Amended Complaint.

The same point bears mention with respect to Halbert's strategic choice not to address in his Opposition the substance of the Trustee's evidence concerning Halbert's close and highly suspect relationship with the mastermind of the Woodbridge Ponzi scheme.  That strategic decision does not limit Halbert's opportunity to mount a full defense against the Amended Complaint, or to plead and prove a good faith affirmative defense.  The substantive merits of the Adversary Proceeding are not before the Court, and all parties' rights with respect thereto are preserved.

9. This is not a fluke or a reflection of dilatoriness on anyone's part. Rather, it is precisely what the sole *Scheduling Order* [Docket No. 23] (the "Scheduling Order") entered in this Adversary Proceeding contemplated. The Scheduling Order was identical to orders issued in scores of other adversary proceedings, as reflected in its caption and Exhibit 1. It provided the parties two options: they could either voluntarily agree to suspend all discovery and all progress toward trial while they attempted to reach a mediated resolution, *see* Scheduling Order ¶¶ 5–8, or they could proceed simultaneously with both mediation and progress toward a litigated resolution – including full fact and expert discovery, dispositive motions, and ultimately trial, *see id.* ¶ 9 (providing an alternative schedule that would govern "[i]f either party does not agree to toll discovery until after the conclusion of mediation"). Under that alternative schedule:

- Initial disclosures in the Adversary Proceeding would have been due October 5, 2020. *See id.* ¶ 9(b).
- All fact discovery in the Adversary Proceeding would have been completed by January 4, 2021. *See id.* ¶ 9(c).
- Opening expert reports in the Adversary Proceeding would have been due by February 16, 2021, with a detailed schedule for rebuttal expert reports and expert reports on the discrete issue of solvency. *See id.* ¶ 9(d).
- All expert discovery – and hence all discovery of any kind – in the Adversary Proceeding would have been completed by June 1, 2021. *See id.*
- Dispositive motions in the Adversary Proceeding would have been due by July 1, 2021. *See id.* ¶ 10.

10. The alternative schedule set out above was fully available to Defendant for the asking. No consent of the Trustee was required, and no motion to the Court was necessary. Had

the alternative schedule been pursued, the Motion to Amend would likely have been filed significantly earlier, once the parties made their initial disclosures. Had it not been, then Defendant would have a colorable basis for opposing leave to amend to the extent that any of the foregoing benchmarks had already been completed and would need to be revisited in light of the proposed Amended Complaint.

11. As it is, however, Defendant freely chose not to proceed down this alternative path and instead elected to agree to essentially stay all litigation of the Adversary Proceeding while the parties explored the possibility of settlement. Defendant's choice in that regard was certainly reasonable. And with Defendant having made that election, the Trustee was equally entitled to suspend all litigation efforts. What is not reasonable is for Defendant to now argue that the mere passage of time – while the Adversary Proceeding was essentially stayed – counts against the Trustee as "undue delay."

12. On these facts, there is no undue delay. At most, there is "delay alone," or the mere passage of time, which even the Opposition concedes is "an insufficient ground to deny leave to amend …." Opp'n ¶ 18. The Opposition concedes this point because the case law is unequivocal. *See, e.g.*, *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272-73 (3d Cir. 2001) ("[D]elay alone is an insufficient ground to deny leave to amend."); *Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999) ("[D]elay by itself … is insufficient to justify denying a motion to amend."); *State Tchrs. Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) ("Mere delay … does not provide a basis for a district court to deny the right to amend.").

13. Nor has there been any prejudicial delay. The Opposition points to nothing Defendant could or would have done differently if the Amended Complaint had been filed on December 1, 2019 in place of the Original Complaint. Instead, the Opposition's arguments

concerning prejudice are misfocused on the alleged "prejudice" of having to defend against the Amended Complaint *at all* – which of course is not the standard. *See, e.g.*, Opp'n ¶¶ 23–24 (arguing that any complaint seeking avoidance of principal repayments – regardless of whether it was filed in December 2019 or June 2021 – "will require a significantly more vigorous, and correspondingly costly defense").

14. The prejudice inquiry under Rule 15 is whether the delay itself has been prejudicial – as it might be if, for example, necessary witnesses and documents that would have been available had the Amended Complaint been filed on December 1, 2019 (in place of the Original Complaint) are now no longer available, or if fact discovery or expert reports had already been completed on the basis of the Original Complaint and would now need to be revisited in light of the Amended Complaint. *See, e.g.*, *Dole v. Arco. Chem. Co.*, 921 F.2d 484, 488 (3d Cir. 1990) (the type of "prejudice" required to defeat amendment under Rule 15(a) is a "showing that [the defendant] was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the ... amendments been timely").

**B. The Trustee Has Acted In Good Faith**

15. The Trustee is a fiduciary who undertakes his responsibilities to the thousands of victims of the Woodbridge Ponzi scheme with utmost seriousness. The Opposition's misguided assertion that the Motion to Amend was filed "to increase the costs of this case and create fear of astronomical claims," Opp'n ¶ 27, appears to be based on the misapprehension that a resort to litigation "after the parties failed to find an amicable resolution" in mediation, *id*., is somehow retaliatory or outside the norm. Appropriate context shows that this is not true.

16. Based on a detailed forensic accounting of the Debtors' books and records, the Trustee initially pursued claims against approximately 675 potential defendants or groups of defendants, including hundreds of net winners. The Trustee was able to reach resolutions with

9

250 potential defendants without initiating litigation, and ultimately filed adversary complaints against 425 others. Of those, 230 have been resolved, 136 are in various stages of the default process, and 59 – including this Adversary Proceeding – are open.[4]

17. Managing litigation of this scale is a tremendous undertaking. This Court's mediation program is an important tool that allows matters to be resolved in a cost-effective and efficient manner if the parties so desire, while nonetheless safeguarding the rights of parties to seek to litigate their claims on the merits if they so choose. As detailed above, the Scheduling Order entered in this Adversary Proceeding is identical to scheduling orders entered in scores of other adversary proceedings. It provided Defendant with the choice to either suspend litigation and focus on mediation, or to press forward with mediation and litigation simultaneously. Defendant chose the former option, and as a result the traditional path of litigation, including initial disclosures, discovery, motion practice, and the like, was effectively stayed.

18. Had Defendant chosen to simultaneously engage in litigation, the facts giving rise to the Motion to Amend would undoubtedly have been uncovered in the process of preparing initial disclosures or, at the latest, early in the discovery process. Had that litigation path been chosen, the Motion to Amend would have been filed much earlier. As it was, however, both sides suspended their litigation efforts, and the process of further factual investigation was deferred while the parties attempted to reach a consensual resolution.

19. During the course of the mediation process, it is not uncommon for parties to undertake further investigation of materials in their possession. The Trustee did so, and ultimately discerned based on records in his possession that there are serious questions as to Halbert's good faith. The Trustee attempted to mediate with Halbert in good faith, but

---

[4] The figures in this paragraph are approximations.

Defendant's failure to take the process seriously (including by failing to timely submit an opening brief) resulted in significant wasted effort. Nonetheless, the Trustee agreed to schedule a second session, though it ultimately never took place.[5] Once it was clear that the matter would not be resolved consensually through mediation, the Trustee promptly filed the Motion to Amend.

20. Nothing about the foregoing sequence of events suggests bad faith. The time that elapsed between the filing of the Original Complaint and the filing of the Motion to Amend is attributable to the parties' joint decision to suspend litigation while they pursued mediation. The fact that the Motion to Amend was filed after mediation was unsuccessful is an unremarkable instance of litigation resuming when mediation reaches an impasse. And the fact that no other net winner is the subject of a similar motion to amend is a consequence of the fact that Halbert is the only net winner defendant the Trustee is aware of for whom there are serious questions of good faith.

**C.      The Amended Complaint Is Not Futile Because the Rule 15(c) Standard is Met**

21. The traditional test for whether a proposed amendment is futile is whether the proposed amended complaint states a claim upon which relief can be granted. *See* Mot. ¶ 24. Here, there is no dispute that the Amended Complaint states a valid claim as to each of the transfers – including the principal repayments – on the Halbert Ledger attached thereto as Exhibit 1. The Opposition's futility argument rests instead on the relation-back standard of Rule 15(c), and posits that the Amended Complaint is "futile" because the claims do not meet the standard for relation back and accordingly are time-barred. *See* Opp'n ¶ 28.

---

[5] The Opposition incorrectly states that "the parties participated in mediation … on March 17, 2021 and June 14, 2021." Opp'n ¶ 10. In fact, the June 14, 2021 session was cancelled by the mediator once it was clear that no progress would be made.

22. The Amended Complaint asserts avoidance claims that "ar[i]se out of the conduct, transaction, or occurrence set out" in the Original Complaint, Fed. R. Civ. P. 15(c)(1)(B), because the Amended Complaint challenges precisely the same transactions as the Original Complaint. The only difference is that the Original Complaint sought avoidance of only the profits Halbert received on account of the principal he transferred to the Ponzi scheme, whereas the Amended Complaint seeks avoidance of both the profits and the principal repayments on which those profits were allegedly based. This amply suffices under Third Circuit precedent, which directs the Court to "look[] to whether the opposing party has had fair notice of the **general fact situation and legal theory** upon which the amending party proceeds." *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004) (emphasis added; citations omitted). Halbert is and has always been on notice of the "general fact situation and legal theory" upon which the Trustee is proceeding.

23. The Opposition relies primarily on two cases – *Gordon v. Slaughter*, 242 B.R. 97 (Bankr. N.D. Ga. 1999), and *Peltz v. CTC Direct, Inc. (In re MBC Greenhouse, Co.)*, 307 B.R. 787 (Bankr. D. Del. 2004) – for its contrary argument. Neither is availing. In *Gordon*, the sole commonality between the transaction proposed to be added by the amended complaint and the transactions in the original complaint was merely that "they all occurred during the year before the petition was filed." 242 B.R. at 102. And in *MBC Greenhouse*, there was no commonality between the proposed additional transfers and the existing transfers "[a]side from their characterization as preferential transfers and similar payees." 307 B.R. at 793. The newly-added transfers were "a whole new set of specific transactions" which resulted from "different essential facts." *Id*.

24. *Gordon*, *MBC Greenhouse*, and similar cases stand only for the unremarkable proposition that an original complaint's challenge to certain transactions between two parties cannot be bootstrapped under Rule 15(c) to allow subsequent challenges to all other transactions between those same parties, no matter the basis. That proposition has no import here, where the proposed Amended Complaint merely expands the same challenges made in the Original Complaint to encompass both profits and principal repayment, rather than profits alone.

25. Indeed, it is particularly notable that certain of the now-challenged principal repayments at issue in the Amended Complaint were transferred to Halbert as part of a single wire transaction that also included payments of interest. Thus, for example, among the transfers sought to be avoided in the Original Complaint was a payment of $755 in interest on January 22, 2014. *See* Compl. Ex. A at p. 5 of 6. In the Halbert Ledger attached as Exhibit 1 to the Amended Complaint, that same $755 interest payment is reflected, as is the $100,000 principal repayment that accompanied it on the same day. *See* Am. Compl. Ex. 1 at p. 1 of 6. The Debtors' books and records reflect that just a single wire transfer (in the amount of $100,755) was made to Halbert on that date. So, too with a payment of $850 in interest on January 24, 2014, challenged in the Original Complaint: the Amended Complaint challenges that same payment, and now also challenges the $100,000 principal repayment on the same date that was transferred as part of the same wire (for $100,850). *Compare* Compl. Ex. A at p. 5 of 6 *with* Am. Compl. Ex. 1 at p. 1 of 6.

26. The notion that a single combined wire transfer inclusive of both interest and the returned principal on which that interest was paid somehow encompasses two completely different transactions is fanciful. Instead, the correct analysis is that set out in *Martell v. Trilogy Ltd.*, 872 F.2d 322 (9th Cir. 1989), which explains that when a suit is filed in a federal court, the

13

defendant well knows that "the whole transaction described in it will be fully sifted, by amendment if need be, and that the … relief prayed … will not be confined to [the plaintiff's] first statement." *Id*. at 326. Here, the Trustee's Original Complaint amply put Halbert on notice that he was being sued as a net winner in the Woodbridge Ponzi scheme, and thus that the funds he contributed to and received from that Ponzi scheme were being challenged as fraudulent transfers. As a remedy, the Trustee's Original Complaint sought recovery only of Halbert's net profits. The Amended Complaint now expands the universe of transfers subject to the fraudulent transfer remedy to include the repayments of principal that generated those net profits. These are not different transactions; they are facets of the same transaction.

### III. CONCLUSION

For all the reasons set out above and in the Motion to Amend, the Trustee respectfully requests that the Court grant leave to amend.

| | | |
|---|---|---|
| Dated: | August 16, 2021<br>Wilmington, Delaware | PACHULSKI STANG ZIEHL & JONES LLP |

*/s/ Colin R. Robinson*
Richard M. Pachulski (CA Bar No. 90073)
Andrew W. Caine (CA Bar No. 110345)
Bradford J. Sandler (DE Bar No. 4142)
Jason S. Pomerantz (CA Bar No. 157216)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Tel.: (302) 652-4100
Fax: (302) 652-4400
Email: rpachulski@pszjlaw.com
       acaine@pszjlaw.com
       bsandler@pszjlaw.com
       jpomerantz@pszjlaw.com
       crobinson@pszjlaw.com

-and-

KTBS LAW LLP
*f/k/a Klee, Tuchin, Bogdanoff & Stern LLP*
Kenneth N. Klee (*pro hac vice*)
Michael L. Tuchin (*pro hac vice*)
David A. Fidler (*pro hac vice*)
Robert J. Pfister (*pro hac vice*)
Jonathan M. Weiss (*pro hac vice*)
1801 Century Park East, 26th Floor
Los Angeles, California 90067
Tel: (310) 407-4000
Fax: (310) 407-9090

*Counsel for the Plaintiffs*