# **EXHIBIT A**

```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE

                                    .  Chapter 11
IN RE:                              .
                                    .  Case No. 17-12560(JKS)
WOODBRIDGE GROUP OF                 .
COMPANIES, LLC, et al,              .  824 Market Street
                                    .  Wilmington, Delaware 19801
               Debtors.  .
. . . . . . . . . . . . . . . .     .  Tuesday, October 19, 2021
MICHAEL GOLDBERG, as                .
Liquidating Trustee,                .  Adv. Proc. No. 19-51027(JKS)
                                    .
        vs.                         .
                                    .
KENNETH HALBERT.                    .
. . . . . . . . . . . . . . .       .
```

```
   TRANSCRIPT OF VIDEO HEARING RE:  ORAL ARGUMENT ON PLAINTIFF'S
         MOTION FOR LEAVE TO FILE AMENDED COMPLAINT
            BEFORE THE HONORABLE J. KATE STICKLES
                UNITED STATES BANKRUPTCY JUDGE
```

```
APPEARANCES VIA ZOOM:

For the Plaintiff/
Liquidating Trustee:        Richard Pachulski, Esq.
                            Colin R. Robinson, Esq.
                            Jason Pomerantz, Esq.
                            PACHULSKI, STANG, ZIEHL
                             & JONES, LLP

                            Robert Pfister, Esq.
                            Michael L. Tuchin, Esq.
                            Jonathan M. Weiss, Esq.
                            KTBS LAW, LLP


(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Madeline Dungey, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

APPEARANCES VIA ZOOM:  (Continued)

Plaintiff/
Liquidating Trustee:          Michael Goldberg, Esq.
                              AKERMAN, LLP

For the Woodbridge
Defendants:                   Michael Joyce, Esq.
                              JOYCE, LLC

For the Defendant
Kenneth Halbert:              Gregory Hauswirth, Esq.
                              Patrick Carothers, Esq.
                              LEECH, TISHMAN, FUSCALDO
                               & LAMPL, LLC

Also Appearing:               Ian Bifferato, Esq., Mediator
                              THE BIFFERATO FIRM, PA

                              Nicholas Troszak
                              Thomas Jeremiassen
                              "DSI"

                              Uday Gorrepati
                              "ABI PROJECT"

                              Matthew Breen
                              Paula Subda
                              U.S. BANKRUPTCY COURT

INDEX

                                                    Page

ARGUMENT BY MR. PFISTER                              6

ARGUMENT BY MR. CAROTHERS                            35

FURTHER ARGUMENT BY MR. PFISTER                      54

COURT DECISION                                 (Reserved)

1        (Proceedings commence at 3:07 p.m.)

2        THE ECRO:  All right.  Very sorry about that.

3   Counsel, you are live in the courtroom and the hearing is

4   about to begin.  Please remember to state your name for the

5   record when you speak and every time you speak.  Please keep

6   your video off and stay muted if you are not speaking to the

7   Judge, so the Judge can concentrate on the parties that are

8   presenting at the time.  Thank you.

9        THE COURT:  Good afternoon, Counsel.  This is Judge

10  Stickles.  We apologize for that delay.

11        We are on the record in the case of Woodbridge

12  Group of Companies, Case Number 17-12560.  This is the oral

13  argument on plaintiff's motion for leave to file an amended

14  complaint in the Goldberg v. Halbert adversary proceeding,

15  Number 19-51027.

16        Before the parties proceed this afternoon with

17  their argument, I would ask that each of you address whether

18  the Cureton standard applies to this contested matter; and,

19  assuming so, which of those factors are at issue from your

20  client's perspective.

21        And with that, I'll let the trustee's counsel

22  begin.

23        MR. ROBINSON:  Good afternoon, Your Honor.  Colin

24  Robinson, Pachulski, Stang, Ziehl & Jones.

25        THE COURT:  Good afternoon.

1          MR. ROBINSON:  I'll be -- good afternoon.  With me

2     today is Mr. Rob Pfister, who will be handling the oral

3     argument today for the liquidating trustee.

4          Your Honor, also, Mr. Thomas Jeremiassen, who

5     submitted a declaration in support of the motion, is here

6     from DSI.

7          And Your Honor, last, but not least is Mr. Michael

8     Goldberg, who is the liquidation trustee.

9          And we just wanted to take this opportunity to

10    introduce you to Mr. Goldberg, we haven't had a chance in the

11    prior hearings.  And since Your Honor took over the cases, we

12    thought this would be a good opportunity.

13         THE COURT:  Okay.  Terrific.  Nice to meet you, Mr.

14    Goldberg.

15         MR. GOLDBERG:  Likewise.  Good afternoon, Your

16    Honor.

17         THE COURT:  Good afternoon.

18         MR. ROBINSON:  Your Honor, just by way, I -- we

19    always like to give you -- even though we have one item on

20    the agenda today, the oral argument, I just wanted to give

21    you one kind of quick update as we proceed with the other

22    adversary proceedings because we did file a stratus report in

23    September.  Mid-October, I think we have hearings set at the

24    end of the month on several summary judgment motions -- I'm

25    sorry, motions for default judgment.

1            So our numbers -- as I said in our last hearing on

2     an unrelated matter, our numbers change weekly and monthly.

3     So the numbers that we have in default, which is around 135,

4     will be down to about 100 by the end of this month.  We will

5     have a couple of the default matters come back open.  I think

6     a good result sometimes of default is actually parties wake

7     up and they get in touch with you, so we expect to actually

8     put a couple of matters back on the mediation track.  So,

9     just general numbers, that's where we are.  That's the real

10    only adjustment.  We'll have about 60 matters open, 100 left

11    that we're pursuing default, either an entry of default or

12    the default judgment stage.  So that's where we are on the

13    adversary proceedings, in general.  I just like to get the

14    court updated.

15            And then I'll turn it over to Mr. Pfister, if

16    that's okay, Your Honor.

17            THE COURT:  Thank you -- certainly.  Thank you, Mr.

18    Robinson.  I appreciate the update.

19            MR. ROBINSON:  You're welcome.

20            THE COURT:  Mr. Pfister --

21            MR. PFISTER:  I think I'm muted.

22            THE COURT:  Good afternoon.  I couldn't hear you.

23            MR. PFISTER:  I apologize, Your Honor.  Rob Pfister

24    from the Klee Tuchin firm on behalf of the trustee.  It's a

25    pleasure to appear before Your Honor today.

1          I want to address the question that you asked at

2     the outset, which is which of the Cureton factors are before

3     the -- or are at issue in the case.  The Cureton factors are

4     whether the plaintiff's delay in seeking the amendment is

5     undue, whether it is motivated by bad faith, or whether it is

6     prejudicial to the opposing party.

7          In our judgment, the only -- in our understanding

8     of the arguments, the only issue that has been raised in

9     opposition is undue delay.  There is in the opposition brief

10    a brief mention of bad faith.  I'm certainly going to address

11    that.  There has, in our judgment and in our view -- and I

12    hope to persuade Your Honor, there has been no bad faith, but

13    they do make a bad faith argument, a brief one.

14         And then prejudicial delay, which is different than

15    undue delay.  They also make a prejudicial delay argument.

16    But as I hope to explain in a few moments, I don't believe

17    prejudicial delay is truly at issue here.  So I think this is

18    entirely an undue delay case -- an undue delay argument by

19    the defendant, in terms of the Cureton factors.  Did that

20    answer Your Honor's question?

21              THE COURT:  Yes, it does.  Thank you.

22              MR. PFISTER:  Thank you.

23         So I'd like to start with a brief overview of Ponzi

24    scheme principles.  These are, I believe, undisputed, at

25    least for purposes of this motion, but I believe they set the

1    framework for understanding what happened here and the time

2    line on which it happened.  And I believe they're very

3    important in assessing the question of undue delay and in

4    assessing the question of bad faith.

5         In Ponzi schemes, there are net winners and there

6    are net losers.  When a Ponzi scheme comes crashing down, as

7    the Woodbridge Ponzi scheme did, there are always more net

8    losers than net winners.  By "net losers," we mean

9    individuals who ultimately took out more from the Ponzi

10   scheme than they put in.  So, if they put in $100 and they

11   received returns of $110, they are a net winner in the sense

12   that they got $10 more than they put in.

13        THE COURT:  That's a net winner, correct?

14        MR. PFISTER:  That's a net winner --

15        THE COURT:  Okay.  I --

16        MR. PFISTER:  -- correct.

17        THE COURT:  I just -- I misheard you.  Okay.  But

18   we're on the same page.

19        MR. PFISTER:  Okay.  I may have -- if I said that's

20   a net loser, I misspoke --

21        THE COURT:  I might --

22        MR. PFISTER:  -- and I --

23        THE COURT:  -- have --

24        MR. PFISTER:  -- apologize.

25        THE COURT:  -- misunderstood you.

1           MR. PFISTER:  Okay.  And a net loser then, by

2    contrast, is somebody who took out less than they put in.

3    So, if they put in $100 and they got back $90, they are a net

4    loser by the amount of $10.

5           Now the vast majority of people who invested in the

6    Woodbridge Ponzi scheme, which raised approximately $1.2

7    billion from nearly 10,000 investors, the vast majority of

8    those people, upwards of 80 percent of them, were net losers;

9    that is, they withdrew less than they had put in.  Those

10   individuals are the beneficiaries of the Woodbridge

11   Liquidation Trust, of which Mr. Goldberg is the trustee, and

12   on whose behalf he brings this action.

13          The net winners, by contrast, those individuals are

14   defendants in avoidance actions.  And the law is very clear

15   that, for net winners, the amount that they received from the

16   Ponzi scheme in excess of what they put in -- that is, their

17   profits -- those are absolutely always recoverable as actual

18   intent fraudulent transfers; not because the participants

19   themselves -- that is, the investors -- had fraudulent

20   intent, but because the Ponzi scheme itself was an actual

21   intent fraud.  And the law is clear that the relevant intent

22   in that regard is the Ponzi schemer's intent.

23          So -- and so people who have been sued as net

24   winners to return their fictitious profits, the law is very

25   clear that those profits aren't real profits; they are simply

1    funds that were stolen from other investors, the net losers,

2    and those have to come back and those are recoverable.

3         Almost always -- and I'll get to the "almost" --

4    but almost always, the net winners are allowed to keep the

5    principal that they received that was back -- that was

6    received back.  So, going back to our initial example, the

7    net winner who put in $100 and received $110 back, the $10

8    absolutely comes back no matter what, regardless of good

9    faith, regardless of anything else.  The $100 that the person

10   invested almost certainly is not recoverable as a fraudulent

11   transfer in the vast majority of cases.

12        The reason is because of an affirmative defense

13   under Section 548(c) of the Code.  And this tracks in

14   analogous provisions of state law that have adopted the

15   Uniform Fraudulent Transfer Act or the Uniform Voidable

16   Transfer Act.  And it provides that a defendant, to the

17   extent that the transferee gave value to the debtor in

18   exchange for such transfer, then that portion of the transfer

19   is unavoidable.

20        In the vast majority of cases, a person who put

21   $100 into a Ponzi scheme and got back $110 has a 548(c)

22   defense as to the $100 that he or she put in; and, therefore,

23   that amount would not be recoverable as a fraudulent

24   transfer, whether under the Bankruptcy Code or under

25   analogous state law.  It's -- the reason -- but the reason

1    for that is the 548(c) affirmative defense.

2         Now the law is clear, both in the -- in 548(c) and

3    in analogous state law, that it is technically an affirmative

4    defense that the defendant must plead and prove, in order not

5    to have to return the $100 of invested principal.

6         And I think it is very important here, in terms of

7    setting the stage, to understand that, if the trustee had

8    been so inclined, he could have sued every single net winner

9    and demanded both the return of their fictitious profits and

10   the return of the principal that they had invested, and then

11   required each of those net winners to file an answer, plead

12   the 548(c) affirmative defense of value and good faith, and

13   prove that those individuals acted in good faith, and forced

14   everyone to jump through those hoops, in order to get a

15   creditor or not have to return the amount of principal that

16   they invested.

17        Now the reason that the trustee did not do that is

18   because the trustee is a fiduciary, he cares deeply about the

19   victims of the Woodbridge Ponzi scheme, and he has

20   obligations when he is deciding how to commence litigation.

21   His obligation is to take into account the cost and expense

22   that litigation will bring, the burdens that it will put on

23   his own counsel to force everyone to plead and prove these

24   and to really make settlement very difficult, and then the

25   amount of expected, you know, return that that would have an

1    effect on.

2          And it would have a great effect because, if every

3    net winner got a lawsuit that said you have to return every

4    single dollar you put in, including amounts that are -- every

5    single dollar that you got back -- pardon me -- including

6    amounts that are just a return of principal, first of all, it

7    would cause great consternation among defendants and more

8    than the consternation of simply being sued, which is, in and

9    of itself, certainly, not a pleasant experience.  And then it

10   would force them to litigate the case, again, as though it

11   were a hundred-and-ten-dollar case in our example, as opposed

12   to a ten-dollar case, which is a case to get back just the

13   fictitious profits.

14         In addition to stress and strain and legal costs,

15   that is going to reduce, ultimately, the recoveries that the

16   trustee is likely to get because, in these cases, when the

17   trustee files hundreds of actions and attempts to mediate and

18   resolve those actions as consensually as possible and present

19   only those disputes to the Court that require the Court's

20   intervention, that benefits everybody.

21         It certainly benefits the trust, in the form of

22   legal fees.  It benefits the Court, in the sense of not

23   having to hear and decide disputes that don't need to be

24   brought before it.  It benefits the defendants, in terms of

25   not having to defend against an allegation that they have to

1  return every single penny they received from the Ponzi

2  scheme.  And ultimately, it results in much greater

3  settlements because the less that is spent on legal fees, the

4  more that parties can come to the table in mediation,

5  ideally, and reach a resolution.  So that is really an

6  appropriate way of proceeding, the decision not to assume

7  that everybody acted in bad faith, but instead to proceed on

8  the assumption and to seek recovery of the fictitious profits

9  only.

10       This case bears that out.  Of all of the adversary

11  -- well, of all of the demands -- because, importantly, when

12  the trustee -- and we indicate -- these are the numbers in

13  Paragraph 16 of our reply brief that Mr. Robinson averted to.

14  But the trustee initially pursued claims against 675

15  potential defendants, but was able to reach resolution with

16  250 of those defendants without ever initiating litigation.

17  So demand letters go out, parties engage in constructive

18  dialogue, agreements are reached, and the matter was resolved

19  prior to an adversary proceeding ever hitting the docket.

20       Adversary complaints were filed in 425 others.  And

21  of those, 230 have been consensually resolved, aside from the

22  -- a few potential additional ones that Mr. Robinson

23  mentioned -- 136 are in various stages of the default

24  process, and now there's just 55 that are open.  So this

25  strategy of pursuing only what the trustee believed would be

1   the likely outcome and the likely liability of each defendant

2   had great dividends in this case, in terms of streamlining

3   this litigation for the parties and the Courts.

4          The other thing I will note there is 136 default

5   judgments.  An individual who has a default judgment, if the

6   trustee had pled you must return the entirety of the

7   transfers that you received, individuals, for any number of

8   reasons, may not be able to mount a defense to a complaint.

9   And those default judgments, had they been predicated on the

10  notion that each and every one of those defendants was not

11  likely to be able to avail himself or herself of the good

12  faith affirmative defense, those default judgments would be

13  in amounts greatly more than they are.  And frankly, if we

14  were to examine the facts of the cases, amounts that are

15  likely not factually appropriate, assuming that there was no

16  issue as to the defendant's ability to plead and prove the

17  bad faith -- or the good faith defense.

18         So I think that's an important overview because I

19  think it frames why the trustee proceeded the way he did in

20  the course of bringing these actions and pursuing these

21  defendants.

22         Now, of all those numbers I gave you and of all the

23  individuals and defendants that the trustee has pursued,

24  there is precisely one, to date -- and we know of no others -

25  - there is precisely one -- and this is, again, strictly in

1    the context of the net winner lawsuits; we're not talking

2    about brokers or anything like that -- but there is precisely

3    one net winner for whom the trustee has developed very

4    serious, grounded -- well grounded suspicions that this

5    individual -- and that's Mr. Halbert, whose case we're here

6    today on -- is unlikely to be able to avail himself of the

7    548(c) affirmative defense; one person out of six -- out of

8    hundreds of lawsuits that were filed.

9         I'm going to give a very brief overview of the

10   evidence that we set out in our motion to amend.  But I'm

11   going to preface that by saying, first of all, the other

12   side, in its opposition, didn't contest any of this.  They

13   have the full right to contest the merits of the case, if the

14   Court grants leave to amend and this is the new operative

15   complaint; obviously, they can take issue with these facts.

16   But for purposes of this motion, I believe these facts are

17   undisputed for purposes of whether to assess leave to amend.

18        Now -- so this goes to why does the trustee believe

19   or have good cause to believe that Kenneth Halbert may not be

20   entitled to the 548(c) affirmative defense of good faith,

21   which is his burden to plead and prove.

22        First of all, Mr. Halbert's loan documentation is

23   different than the loan documentation of every other investor

24   of which the trustee is currently aware.  In particular, his

25   loan documentation appears to have granted him liens on the

1  actual underlying properties that were part of the Ponzi

2  scheme, as opposed to liens on LLC interests, which were all

3  determined to be unperfected and avoidable.  Mr. Halbert

4  appears to have negotiated this -- these direct liens on the

5  properties themselves in a way that is different than

6  everyone else did.

7       Mr. Halbert's payments.  He -- when he made

8  transfers to the debtors, those transfers went to the same

9  entities that everyone else's transfers went to; that is, to

10 the fund entities and the like.  But Mr. Halbert's payments

11 came from entities that are different than the entities that

12 he loaned the funds to.  So, if he made a check out, in terms

13 of sending his -- or sent a wire transfer of his initial

14 investment, when he received a check or wire transfer back,

15 it came from a different entity than the one he had allegedly

16 owed the money to.  That situation also appears to be, at

17 least so far as we can tell, unique to Mr. Halbert.

18      More importantly, I think, Mr. Halbert was privy to

19 loan documentation where Mr. Shapiro himself signed as the

20 manager of the Owlwood entity.  And he was also -- his son

21 had a finder's fee agreement to help find a third-party buyer

22 for the Owlwood entity.  Let me explain why that is so

23 problematic.

24      A central lie of this Ponzi scheme, of the

25 Woodbridge Ponzi scheme, was that the debtors were hard money

1  lenders who lent money to unaffiliated third parties to buy

2  property, and then took a lien on that property, and the

3  money was being lent to unaffiliated third parties.  By

4  seeing, in black and white, the signature of Robert Shapiro

5  as Manager of the Owlwood entity, for example, the

6  inescapable conclusion is that he was aware that the Owlwood

7  entity that owned the property was not a third-party buyer.

8  By having -- by seeing that his son was entering into a

9  finder's fee agreement to find a third-party buyer for the

10  Owlwood Estate, that is irreconcilable with the central

11  thesis of Woodbridge and the Woodbridge Ponzi scheme, which

12  is that these properties were owned by third-party buyers.

13       We have other evidence, as well, that we've

14  included in the motion -- in the declarations in support of

15  the motion to amend:

16       Personal correspondence, where Mr. Halbert would

17  engage in emails directly with Mr. Shapiro.  He would be

18  offered special deals.  He would be offered the use of Mr.

19  Shapiro's properties in Colorado for vacation homes.  He

20  appeared to have a direct line of communication to Mr.

21  Shapiro, if he thought anything was amiss, in the form of an

22  interest payment or the like.  This level of communication is

23  something, again, we have not seen.  This level is access is

24  something we have not seen.  But most importantly, this level

25  of bright, shiny red flags that all was not well, all was not

1   as was being represented with respect to Woodbridge is, in

2   fact, so far as we are aware, unique to Mr. Halbert and to no

3   other investor.

4          And again, in the opposition to the motion to

5   dismiss -- motion to amend, the defendant never says, you

6   know, it's a different Kenneth Halbert whose son signed that

7   finder's fee agreement; or I never saw this paper, where Mr.

8   Shapiro signed as manager; or, you know, any other factual

9   defense to these types of allegations.

10         Now, again, I'm not saying that defense -- I'm not

11  saying he can't defend on those grounds in the course of

12  ordinary -- of litigating this adversary proceeding.  What I

13  am saying is, is that, for purposes of what's before Your

14  Honor today, whether we have -- why we are seeking leave to

15  amend, the evidence stands unrebutted on this motion that

16  Kenneth Halbert is uniquely differently situated than every

17  other net winner defendant who the trustee has sued.  So I

18  think that's the important background, both in terms of the

19  Ponzi scheme as a whole and with respect to Kenneth Halbert

20  and why, among all of the other net winners, he stands out as

21  completely unique.

22         So, turning then to the Rule 15 standard that Your

23  Honor opened the questions with, the first thing I would

24  notge about the standard is, is that (indiscernible) freely

25  given as justice so requires.  This is a matter where the

1   Court has substantial and considerable discretion in

2   considering the factors.  The Third Circuit has set out

3   certain guideposts that the Court should consider, including

4   in the Cureton case.  But ultimately, this is a question that

5   comes down to Your Honor's weighing of the situation and

6   application of what does justice require.

7         Undue delay is what I believe is the primary, if

8   not sole argument that's offered on the other side.  There is

9   no question that there is a temporal delay between the filing

10  of the adversary complaint and the filing of the motion to

11  amend.  That is a calendar fact.  There were -- I believe the

12  emphasis is on 19 months that elapsed from the filing of the

13  original complaint to the filing of the motion to amend.  The

14  -- and that is a delay.  The question, though, is not whether

15  was there delay; the question is, is whether there was undue

16  delay.  And to determine whether there was undue delay, the

17  Court has to look at the entire facts and circumstances

18  before it.

19         The most important of those facts and

20  circumstances, I would submit, Your Honor, is the scheduling

21  order and the parties' agreements with respect to scheduling

22  in these adversaries.  We cited Your Honor to the scheduling

23  order that's at Docket 23 in the adversary proceeding.  This

24  is identical to scheduling orders that were entered across

25  the board in these adversary proceedings, when hundreds of

1    adversary proceedings were filed.

2           The scheduling order gave the parties -- and

3    ultimately, it gave the defendant because both parties had to

4    agree -- so it gave the defendant a choice:

5           Choice number one, which was absolutely available

6    to the defendant, was to proceed immediately down the

7    litigation path.  And if the defendant -- the defendant did

8    not need the plaintiff's consent for this.  It could have

9    unilaterally demanded to litigate the adversary proceeding

10   promptly and at full bore.  So the complaint was filed in

11   twenty nine -- December of 2019; the answer was filed in

12   January of 2020.

13          Under the scheduling order, initial disclosures

14   would have been due in October of 2020, all fact discovery

15   would have been completed in January of 2021, expert reports

16   would have been due in February, all expert discovery would

17   have been done by June, dispositive motions would have been

18   done by July 1 of 2021.  That was an option available to the

19   defendant and it was an option available to every other

20   defendant who was sued by the trustee at the defendant's

21   option.

22          THE COURT:  Did any defendant accept that option?

23          MR. PFISTER:  To my understanding -- and I'll ask

24   Mr. Robinson to correct me if I'm wrong -- but to my

25   understanding, the answer is no.

1          MR. ROBINSON:  That's correct, Your Honor.

2          THE COURT:  Okay.  Thank you.

3          MR. PFISTER:  So, as I believe -- and Mr. Robinson

4     concurs -- as I believe every single defendant decided, the

5     better route here, when a mass of adversary complaints have

6     been filed, the -- an appropriate route would be to, instead,

7     see if the parties could suspend discovery and all progress

8     towards trial and see if they could reach a mediated

9     resolution.

10          As the numbers that I previously discussed with

11     Your Honor indicate, when we went from 600 plus people being

12     approached with demands, hundreds of them settling before

13     suit was even filed; and then, of those hundreds, you know,

14     hundreds more then consensually resolved, this mediation

15     option has proven to be very fruitful and very worthwhile in

16     getting parties to get to a solution that works better than

17     spending a bunch of money on lawyer fees and, you know,

18     thereby decreasing the amount of money that's available and -

19     - to be made available in settlement, and also just the

20     burden of litigation.

21          So, as a result of this scheduling order and as a

22     result of the defendant's decision, conscious decision, to go

23     down the mediation route, all of these deadlines and dates

24     that had been available were suspended.  The parties did not

25     spend time, money, resources on litigating this case to the

1    hilt; and, instead, they went to mediation.

2            Now, in preparation for mediation, as any case that

3    is ever mediated that that is the case, parties prepare.

4    They go through, they assess claims, defenses, and issues in

5    a way that they would have done at the outset of the

6    discovery process as part of the parties' planning meeting.

7    But they do engage in an informal process of figuring out

8    what the issues are between the parties and the like.

9            And as part of that process of preparing, getting

10   ready, and deciding how to proceed with respect to mediation,

11   that is when the trustee became aware, entirely based on

12   documents to which the trustee had access to -- and so I want

13   to be -- I think this is an important point because we'll get

14   to this on bad faith, where the argument on bad faith is, you

15   know, you are penalizing me for participating in mediation,

16   or something.  But the materials that we have relied on and

17   cited to Your Honor with respect to the loans where the

18   payments were made and where the payments came from, with

19   respect to the emails, with respect to the finder's fee

20   agreement for the defendant's son and the like, those are all

21   materials that came from the trustee's possession.

22            And as a result of those materials, it appeared to

23   the trustee that Mr. Halbert is, to date, the one and likely

24   only one of the net winner defendants who has a serious issue

25   on good faith.

1             THE COURT:  I --

2             MR. PFISTER:  And it is for that --

3             THE COURT:  Could I stop you a second?

4             MR. PFISTER:  Sure.

5             THE COURT:  The materials that you're referring to

6    that you became more aware of at the time of mediation, they

7    were materials that were in the trust's possession -- not the

8    "trust" because it wasn't necessarily the trust at the time -

9    - but they were -- you had -- they were available during the

10   bankruptcy.  Is that correct?

11            MR. PFISTER:  That is correct.

12            THE COURT:  Okay.

13            MR. PFISTER:  The -- all of the documents from the

14   debtors are -- became available to the trust when the trust

15   came into existence and the documents were handed over.

16            THE COURT:  Okay.  On the effective date then.

17            MR. PFISTER:  On the --

18            THE COURT:  Okay.

19            MR. PFISTER:  -- effective date, exactly.

20            Now there's an implication, and I want to give a

21   little context to that answer because it is not as though,

22   you know, three -- you know, three boxes of documents came

23   over and said, you know, here's the documents, right?  Go

24   through them.  In fact, this is a mass of information, email

25   -- and much of it is electronic, so archived email accounts

1    going back to the inception of this Ponzi scheme, you know,

2    documents and communications, you know, that are effectively

3    needles in a haystack, to some degree.

4            So I know the defendant says, well, you had all

5    this stuff when you filed the complaint, so, gracious, you

6    know, why didn't you include it in the complaint.  And the

7    answer is:  It's not, you know, three banker's boxes of

8    documents that just decided not to go through.  Instead, we

9    undertook -- the trustee undertook a detailed forensic

10   examination and is in possession of a large amount of

11   material.  The materials that we have found are -- as I

12   would, I think, correctly characterize them, are effectively

13   needles in a very giant haystack.

14           So, in any event, we -- that is the genesis of the

15   motion to amend.  It is not any kind of penalization --

16   penalty or "retaliation," I believe is the word that's used

17   in the defendant's opposition brief, in terms of an

18   allegation of bad faith, for the defendant having mediated.

19   Indeed, mediation is what we want.  We have been able, in

20   mediation, to successfully resolve the vast majority of these

21   claims.  So the trustee has neither the motivation, nor the

22   incentive, in any sense, to penalize individuals who

23   participate in the mediation process, by any means.

24           THE COURT:  Well, was the mediation in this case --

25   and are my notes correct, was it October 2020?

1        MR. PFISTER:  There were two mediations scheduled

2   in this case:  One was -- there were two mediations

3   scheduled; only one took place.  So there was a first

4   session, I don't have the date off the top of my head.  Oh,

5   I'm sorry.  It was March 17th of 2021.  That was the first

6   mediation, March of 2021.  And then there was a June 14th of

7   2021 mediation that was scheduled, but it was ultimately

8   canceled.

9        THE COURT:  Okay.

10       MR. PFISTER:  So it was March 17 of 2021, and our

11  motion to amend was filed on July 12th of 2021, after the

12  failed -- after the June 14th, 2021 mediation session did not

13  take place.

14       THE COURT:  Okay.

15       MR. PFISTER:  So that is the time line by which we

16  go from 19 months to -- from the inception -- or the filing

17  of the original complaint to the filing of the motion to

18  amend in July of 2021.  It is not a time line where the

19  parties engaged in any discovery.  It did not engage in any

20  briefing, they did not engage in any experts, they did not

21  engage in any trial preparation activities at all.  All they

22  did was gear up to a mediation that occurred once, and only

23  once, in March of 2021.  Then, when the -- it appeared that

24  there would be no likelihood of any success in a June 2021

25  mediation, the trustee then filed the motion to amend.

1            So, going back then to the Cureton factors, we

2      would submit, Your Honor, that, although there is delay --

3      that is, there is a temporal difference between the filing of

4      the original complaint and the filing of the motion to amend

5      -- there is -- on the facts of this case, the temporal delay

6      is not an undue delay when you look at the entirety of the

7      situation, as I think the Court is required to do when

8      assessing whether a delay is an undue delay.

9            The remaining factors, prejudicial delay.  This one

10     is important because I think there's a fundamental disconnect

11     between the parties here.  The case law makes clear -- and

12     this is what we pointed out in our reply brief, emphasized it

13     strongly because I think it's an important point -- that it

14     is prejudice that must result from the delay itself, not

15     prejudice from facing new allegations that you could have

16     faced when the lawsuit was filed.

17           Obviously, no one likes to be subjected to a

18     lawsuit.  Obviously, no one likes to be subjected to a motion

19     to amend that potentially increases the scope of the

20     defendant's liability.  That said, the prejudice, there is no

21     prejudice that is alleged here.

22           THE COURT:  So --

23           MR. PFISTER:  There is no --

24           THE COURT:  Let me make sure I understand your

25     argument.  So --

1          MR. PFISTER:  Sure.

2          THE COURT:  -- an amended complaint that goes from

3     a million-dollar -- and I'm just rounding off numbers --

4          MR. PFISTER:  Uh-huh.

5          THE COURT:  -- a million-dollar allegation to a

6     thirty-five-million-dollar allegation is not prejudice.

7          MR. PFISTER:  It is not prejudice under Rule 15's

8     and Cureton's standard of what is a prejudicial delay because

9     the delay did not -- if the delay, for example, had caused --

10    let's say Mr. Halbert had a start witness that he was going

11    to introduce, and that witness died between the filing of the

12    initial complaint and the filing of the motion to amend.

13    That would be an argument for prejudicial delay, right?

14         But the fact is he could have been sued on these

15    counts, on these allegations.  And I want to caveat the 37

16    million because I don't think it's necessarily -- we're not

17    saying this gone from a one-million- to a thirty-seven-

18    million-dollar case.  We're saying that the amount -- that

19    the principal repayments are subject to avoidance and

20    recovery to the extent that Mr. Halbert cannot show good

21    faith as to each one.  He very well may have a good faith

22    defense as to -- he may have a good faith defense as to all

23    of them, it's possible.  But he very well may have a good

24    faith defense as to certain of the earlier ones, but not the

25    later ones.  Those are fact-intensive issues.  But I don't

1    want to accept the construct from the defendant this is a

2    million to a 37 million case.

3              But in terms of what is a prejudicial delay, no.

4    There is nothing that has happened where his ability to

5    defend against the allegations that are set forth in the

6    amended complaint has been prejudiced by the lapse of time.

7    No witnesses have died, no documents have been destroyed, no

8    funds have been expended.  So it is not a prejudicial delay,

9    which is precisely how Cureton reads.  It is -- I'm quoting

10   from the Third Circuit's opinion, "Leave to deny" -- pardon

11   me.

12              "The Court may deny leave to amend a complaint if a

13              plaintiff's delay in seeking amendment is undue,

14              motivated by bad faith, or prejudicial to the

15              opposing party."

16              The key word there is "if the plaintiff's delay is

17   prejudicial."  And here, there is no prejudice from the

18   delay.  He's in precisely the same circumstance that he would

19   have been in had these allegations been made on December 1 of

20   2019.

21              The defendant next makes a bad faith argument.

22   Again, I think that there is no substance to the bad faith

23   alleged in the opposition, other than there is this

24   significant delay; ergo, there must be bad faith.  The reason

25   I went through the sequence, Your Honor, of the scheduling

1    order and all these other adversary proceeding is, first of

2    all, the trustee takes very seriously any allegation that he

3    has acted in bad faith and is -- those allegations are strong

4    allegations.

5            Here, they are not backed up by anything.  The

6    defendant's opposition brief says it must be in bad faith

7    because 19 months is a long time or because it was after we

8    mediated and we didn't reach a resolution that you then

9    sought to amend the complaint.  That is not bad faith.

10   Handling this lawsuit as every other lawsuit -- adversary

11   proceeding has been handled, in terms of the timing and the

12   scheduling order and mediating first and the like, that's not

13   bad faith.

14           And after the parties failed to reach a result in

15   mediation, when it became clear that there would not be a

16   result in mediation, proceeding with a motion to amend,

17   where, again, there's been no allegation that the factual

18   showing we have set forth as to why there's a serious issue

19   of bad faith here, no allegation that that's incorrect, there

20   is simply no bad faith that has been adequately or clearly or

21   persuasively alleged here.

22           And then the final argument -- and I don't know if

23   it's phrased in Cureton precisely, but I know the defendant

24   makes significant argument about it -- is the so-called

25   "futility" issue.  Futility, traditionally in the Third

1  Circuit case law, is (indiscernible) the complaint state a

2  claim for -- upon which relief can be granted.

3          I don't think there's any dispute here -- in fact,

4  I'm certain there's no dispute here because it wasn't raised

5  in the opposition brief -- that the amended complaint, had it

6  been filed on December 1 of 2019, adequately states a claim

7  against Mr. Halbert upon which relief can be granted; that

8  is, a claim to avoid and recover payments that he received

9  from the Woodbridge Ponzi scheme.  What the defendant has

10  done is said, well, the reason that it would be futile to

11  allow this amendment is because it wouldn't relate back.

12          So, first of all, I'll preface this by saying I

13  don't know -- I don't think the Court has to decide the

14  relation back issue today.  It's not identified in the -- as

15  one of the Cureton factors.  But I think the Court has

16  certainly before it a sufficient record to resolve that

17  issue.  And to say that amendment would not be futile because

18  the new claims -- pardon me -- the amended complaint does

19  relate back.

20          The standard here is in Rule 15(c).  And I think

21  I'll just talk about the standard for a second and then talk

22  about the two circuit cases that I think are the key ones for

23  Your Honor.

24          The standard is:  Does the claim or defense -- did

25  it arise out of the conduct, transaction, or occurrence that

1    was set out in -- or attempted to be set out in the original

2    pleading?  And here, I don't think there can be any dispute

3    that, when we -- the original pleading sets out a claim for

4    avoidance and recovery of fraudulent transfers and lists the

5    precise amounts of interest that are being avoided, and then

6    an amended complaint challenges precisely those same

7    transfers; indeed, some of them that were made, you know, in

8    the same wire transfer.  We pointed this out in Paragraph 25

9    of our reply.  But you know, the same 75 -- seven-hundred-

10   and-fifty-five-dollar interest payment that's reflected on

11   the Halbert ledger of the original complaint, you know, was

12   transferred in the same wire transfer as the one-hundred-

13   thousand-dollar principal repayment that accompanied it on

14   the same day.

15          So, again, I don't know how you could get closer to

16   having the same conduct, transaction, or occurrence than

17   having the same -- literally the same wire transfer payments,

18   the interest portion, and the principal portion.  Interest

19   and principal is inextricably intertwined.  Interest arises

20   out of principal.  And there is -- I don't see an argument

21   that we don't fall within the exact standards of Rule 15.

22          The two circuit cases I'd emphasize for Your Honor

23   are the Bensel case, Third Circuit 2004, where the Third

24   Circuit says:

25          "The Court should look to whether the opposing

1          party has had fair notice of the general fact

2          situation and legal theory upon which the amending

3          party proceeds."

4     General fact situation and legal theory.  General

5     fact situation, this is to avoid and recover transfers made

6     from the Woodbridge Ponzi scheme, specific transfers made

7     from the Woodbridge Ponzi scheme to the Defendant Kenneth

8     Halbert.  The legal theory is avoidance and recovery.  The

9     general factual situation is the specific payments that Mr.

10    Halbert received, except, instead of just the interest

11    portion, it is the principal portion.

12         And then, finally, the second -- and this is where

13    I'll close, unless Your Honor has questions -- the second

14    circuit case I would point the Court to is the Ninth

15    Circuit's Martell case that we cite in our opening brief.

16    And again, I think this -- the analysis here is so concise

17    that I'll quote it, where the Court explains that:

18         "When a suit is filed in a Federal Court under the

19          rules, the defendant knows that the whole

20          transaction described in it will be fully sifted by

21          amendment, if need be, and that the form of the

22          action or the relief prayed or the law relied upon

23          will not be confined to their first statement."

24         And the point there is, is that, when we litigate

25    in the environment we litigate in, which is under the Federal

1    Rule of Civil Procedure, which have amendment provisions in

2    them that allow leave to amend when justice so requires and

3    that allow for relation back when something arose out of the

4    same conduct, transaction, or occurrence, those provisions

5    and the backdrop provide the defendant with ample notice.

6    And there are no notice issues or concerns with respect to

7    potential amendments.  And I think we -- if this case doesn't

8    qualify as falling within the same conduct, transaction, or

9    occurrence under Rule 15(c), I find it hard to imagine a case

10   that would.

11        So I'll close with that, unless has any questions,

12   and reserve, if I may, time to respond to anything

13   defendant's counsel says.

14        THE COURT:  I do have a question before we move on

15   to the defendant's counsel.  I've reviewed the cart of the

16   transfers that attach to exhibit -- attached as Exhibit 1 to

17   the original and the amended complaints, which sets forth the

18   multiple transfers --

19        MR. PFISTER:  Uh-huh.

20        THE COURT:  -- and totals and subtotals.  And I

21   want to make sure that we're on the same page with respect to

22   the value of the transfers.  And I think I understand your

23   comment earlier that, look, this could perhaps be -- have a

24   complete defense to it.  But what is the trustee's allegation

25   with respect to the total dollar value of the alleged

1    fraudulent transfers in the original and amended complaint?

2              MR. PFISTER:  The total dollar value of transfers

3    that are at issue in -- as those terms are broadly defined,

4    and without the caveat that I gave, which I think is an

5    important one, is on the order of 1 million in the original

6    to on the order of 37 million in the amended complaint.

7    Those are accurate numbers.  I just think they need a little

8    context.

9              THE COURT:  Oh, I understand.  Okay.  So, I mean,

10   this was addressed, I believe, in Paragraph 17 of your draft

11   amended complaint.  I just wanted to make sure that I was

12   looking at the same numbers.

13             MR. PFISTER:  Yes, the numbers are correct, Your

14   Honor.  My point is just, for the reasons I stated, it is not

15   necessarily the case that it is a one-million- to thirty-

16   seven-million-dollar exposure, not by any means.

17             THE COURT:  Okay.  Terrific.

18             Okay.  We'll hear from the defendant's counsel.

19   I'm sorry, sir --

20             MR. HAUSWIRTH:  Good afternoon --

21             THE COURT:  -- I can't --

22             MR. HAUSWIRTH:  -- Gregory --

23             THE COURT:  Sorry.  Go ahead.  I couldn't hear you

24   was all I was going to say.

25             MR. HAUSWIRTH:  Not a problem, Your Honor.  Good

1    afternoon.  Gregory Hauswirth of Leech, Tishman, Fuscaldo &

2    Lampl.  Here with me today is my colleague Patrick Carothers,

3    that will go into the argument for the Defendant Kenneth

4    Halbert.

5              THE COURT:  Good afternoon, Mr. Carothers.

6          (No verbal response)

7              THE COURT:  I cannot hear.  Can anyone else not

8    hear, or is it just us?

9              MR. CAROTHERS:  I apologize, Your Honor.  Maybe I

10   had it on mute.

11             THE COURT:  Oh, okay.

12             MR. CAROTHERS:  Can you hear me now?

13             THE COURT:  Terrific.  That -- yes, I can hear you

14   now.

15             MR. CAROTHERS:  I apologize, Your Honor.

16             THE COURT:  No problem.

17             MR. CAROTHERS:  (Indiscernible) my name is Patrick

18   Carothers and I'm here today on behalf of the Defendant

19   Kenneth Halbert.

20             Your Honor, to summarize my argument in a nutshell,

21   I think there's something that has to be said at the outset

22   that's very important, and I'll continue to come back to that

23   point.  The causes of action that are being set forth in the

24   amended complaint, these new causes of action, these are

25   time-barred causes of action.  These actions were not pled in

1   the initial complaint.  Subsequent, we went down a road.  And

2   during that time period, the time period to bring these

3   allegations were barred by the statute of limitations.

4        So, yes, there is, of course, our civil rule of

5   procedure, Rule 15, and we're going to talk about it during

6   the case law and those types of things.  But one of the

7   things that could not be any more prejudicial to Mr. Halbert

8   would be to allow -- for this complaint to come forward and

9   allow for causes of action that have already been time-barred

10  by applicable time limitations to be advanced against him.

11  So, at its core, that Mr. Halbert's argument here today.

12       Now the first thing I think that has to be set

13  forth is that we believe these are two truly completely

14  different cases.  And as I listened to what Mr. Pfister was

15  saying about, you know, if this isn't a case where it's --

16  causes of action arise out of a same transaction and

17  occurrence, where would one be.  Well, it's not this case,

18  Your Honor, because let's look at these two different,

19  distinct cases that were made.

20       And I think, in his opening, in the first ten

21  minutes Mr. Pfister was talking, he really laid out the true

22  distinctions very well, actually, between these two types of

23  cases, which I would describe as, one a very simplistic case;

24  and, to, a rather fact-intensive, complex case.  Let's call

25  them "Case A" and "Case B."

1          Case A is what was pled in the original complaint

2     in which the trustee, the plaintiff, explained is a kind of

3     garden variety Ponzi scheme case, where the cashed-out

4     investors in the Ponzi scheme are sued just for the interest

5     they received from the ill-gotten gains of the fraudulent

6     company.  And that's where the plaintiff has said they

7     pursued some 600 cases against defendants or this kind of

8     garden variety cause of action.  And I agree, it's an action

9     that sometimes is pretty difficult to defend against when

10    you're the defendant in one of those situations.

11         If you invested in the company by a debt investment

12    or other type of investment, and you receive an interest

13    return on your investment, and then it turns out that company

14    that paid you was later deemed to be a Ponzi scheme, absent

15    some other defenses that could be present -- that, actually,

16    Mr. Halbert has articulated that he has to those interest

17    components -- it's a rather simple accounting exercise where

18    you look at the ledger, you see where interest was paid.

19    Usually long before the adversary proceeding is pursued,

20    there's usually a conditional determination in the underlying

21    Chapter 11 that the case was a Ponzi scheme, pretty simple

22    cause of action.

23         Case B, which we would be looking at here, as to

24    what the plaintiff wants to amend this case to be, it's a

25    much difference and advanced cause of action where the

1    allegations have to turn to the fact that the investor now

2    was basically a material participant in the overall Ponzi

3    scheme; that this investor acted in bad faith.  Essentially,

4    when you read the case law, it talks about, you know, who

5    qualifies for these things.  As the plaintiff pointed out,

6    these things don't happen a lot because you're talking about

7    true and actual fraud, basically.  You're saying that this

8    person had enough knowledge that basically they are a true

9    wrongdoer in the overall scheme, they're a co-conspirator of

10   fraud, maybe even potentially -- because we know what

11   eventually happened to Mr. Shapiro -- or possibly a criminal.

12           These are night and day now, when you look at what

13   needs to be proven.  This is a case where, basically, you're

14   going to have a true fraud complaint, a true fraud lawsuit,

15   where before you just had a situation where there was some

16   accounting entries on a piece of paper.  This now delves into

17   light years of a difference between Case A and Case B.

18           And in fact, that's where a lot of these factors

19   under Rule 15 come in.  All four of them, I think, are

20   applicable because of the fact that this case was pursued as

21   a basic Case A type of an action throughout this proceeding,

22   until the mediation abruptly ended.  And I want to talk about

23   that abrupt ending a little bit.

24           But going back again, we now have -- so we have

25   Case A and Case B.  We have Case B that is otherwise barred

1    by the statute of limitations, and we have Case B, in our

2    opinion, completely different from Case A.

3              THE COURT:  Well, let me --

4              MR. CAROTHERS:  So let's --

5              THE COURT:  -- ask you --

6              MR. CAROTHERS:  -- look at -- yeah, go ahead.

7              THE COURT:  One question.  Do you disagree that the

8    amendments -- the amended claims involve the same

9    transactions and investments as the original complaint?

10             MR. CAROTHERS:  There's sort of overlap in the

11   dollar amounts that we have there.  But Mr. Halbert, in many

12   ways -- although the way this documentation was set up looks

13   as if, though, he loaned $37 million overtime, in a nutshell,

14   what he did was he basically established a credit line, a

15   credit facility of a certain amount of money.  He kind of was

16   re-loaning in the same money over the course of time.

17             There's different times -- you know, this went on -

18   - this went on for years.  I think it was, you know, a five-

19   or-six-year period, where these different transactions were

20   made.  And I think that, while maybe, you know, you're

21   looking at the same dollars, you know, that are coming in and

22   out, it's more of a case, when you go to Case B, about what

23   Mr. Halbert knew, what type of relationships he had and the

24   like during those time periods.  So, while maybe it's, you

25   know, the same transactions from a dollar perspective that

1    support both Case B or Case A, there would be evidence in

2    those cases.

3          We're not really looking at it in Case B, in terms,

4    really, of, well, you know, was this money paid and, you

5    know, as a result, you know, did Mr. Halbert owe it back.

6    We're looking at a much more intense factual inquest into

7    fraud, intent, involvement, and those things.  And again, I

8    just think that the dollar amounts there, there were

9    underlying evidences, as opposed to a same or similar case.

10          THE COURT:  Thank you.

11          MR. CAROTHERS:  So, with that as the -- my -- the

12    general backdrop, let's look at these factors --

13          THE COURT:  Yeah.

14          MR. CAROTHERS:  -- that have been brought up.  And

15    again, it was stated in some ways by the plaintiff as though

16    we limited our argument, and I don't think we limited our

17    argument in any ways.  I think our papers show that we had

18    issues under all four of these factors.  I'll at least

19    address them to day to try to clarify that.

20          But the first would be the amendment being undue.

21    And the plaintiff tried to come back and say, well, we were

22    suing 600 people, so we engaged in this strategy that kind of

23    excuses the fact that, you know, we didn't sue Mr. Halbert

24    for the allegations that now we want to sue him for because,

25    you know, that would have been kind of hard, that may have

1  burdened some other defendants, that may have, you know,

2  required us to do, you know, a lot of diligence, looking for

3  needles in a haystack.  Well, I'm not real moved by that.

4  This is -- we're not litigating this as a class action, we're

5  not 1 of 600 people that invested in some sort of a group.

6  It just so happened that the trustee had potentially 600

7  targets to pursue.

8          And the trustee (indiscernible) even though I think

9  he had some hyperbole in his papers, certainly clarified the

10 record today that the trustee is not claiming that they newly

11 discovered this evidence during the course of the litigation.

12 And this is -- and albeit this evidence that they point to I

13 think is week, and we'll talk about it.  But this evidence

14 was at their disposal for a long period of time before they

15 filed these cases, and the Bankruptcy Code has the statutory

16 deadline that it has.

17         And with this type of evidence that's there, yeah,

18 it probably was a bit of a needle in a haystack and was

19 included inside of voluminous documents.  But that's not a

20 surprise to any of us that are involved in these types of

21 large cases.  We have the amount of time that we have to

22 pursue the actions.  And that's why you see, typically,

23 trustees will include these types of, you know, additional

24 pleadings when they bring fraudulent transfers or when you

25 see -- typically, when you'll see a preference action is

1    pursued, you'll see it pursued under 547 and 548, just so the

2    trustee can cover their bases.  There's lots of ways to do

3    that, and including the fact that they had at least enough

4    information in front of them that they could have put down

5    the principal and dropped that other count in.

6         The plaintiff will say, well, that would have

7    really, you know, maybe affected the other 600 cases.  Well,

8    I don't think Mr. Halbert is too concerned about the other

9    599 cases; he's worried about this case, where he's now being

10   sued for $37 million.  So the fact that it may have been

11   burdensome to have reviewed that information, that, you know,

12   there was a needle in a haystack that had to be found, well,

13   that, frankly, is just not an exception to the statute of

14   limitations defense, so that happens in all types of cases;

15   nor did anyone approach Mr. Halbert and ask, you know, to get

16   a tolling agreement or bring this issue in the forefront.

17        Essentially, what the trustee did was say I'm going

18   to file these 600 cases, I'm not going to pay any attention

19   to what I have over here in my boxes, and if it might help me

20   out 20 months into some litigation to pull some of these

21   things out of the box, then I'll bring them to the forefront

22   at that time, and then I'll try to freely amend the

23   complaint.  And I don't think that is proper under these

24   facts.

25        So I think the delay, you know, that is spoken to

1    is undue because the trustee possessed all of the information

2    at the time, and he could have reviewed this and pled it at

3    the outset.  And I'm, frankly, just not moved by the fact

4    that it might have injured their ability to bring other

5    cases.

6          And you know, if they would have reviewed this

7    information -- they said Mr. Halbert was in a class of one --

8    they would have had to just file against one person those

9    additional allegations.  They chose to wait.  And I don't

10   think there's a reason now to allow them to benefit by

11   amending that complaint late, past a deadline that if, for

12   example, Mr. Halbert was the only defendant in this case,

13   they wouldn't be able to come and produce that same evidence

14   as a reason to get past the limitation period.  I don't think

15   Mr. Halbert should be prejudiced himself because it just

16   happened to have been some other work that the trustee had to

17   do during the same period of time.

18         Number two, as far as the prejudicial delay, I

19   couldn't think of a more prejudicial situation than the

20   attempt to amend this complaint over the top of the statute

21   of limitations period being expired.  So I think that one is

22   one of the easier ones to see where Mr. Halbert would be

23   prejudiced by allowing the case to now go forward with his

24   legal rights being essentially ignored as to a defense that

25   he would have to the case.

1          THE COURT:  So let me stop you there.  Your

2    prejudice argument is that he's prejudiced because of the

3    statute of limitations.

4          MR. CAROTHERS:  So, number one, of course, where it

5    says if the delay is seeking an amendment is undue, the undue

6    delay was caused by the trustee in not reviewing the

7    documents and bringing it at that time.

8          THE COURT:  Right.

9          MR. CAROTHERS:  (Indiscernible)

10         THE COURT:  Would --

11         MR. CAROTHERS:  Number two, as far as the amendment

12   being prejudicial to us at this point, I have a couple of

13   arguments there.  A is the statute of limitations has expired

14   in the interim time period.

15         B -- and this kind of goes into the bad faith

16   motivations that I want to discuss.  Mr. Halbert had to spend

17   a fair amount of money pursuing his defense rights in Case A.

18   He had some defenses that were applicable in that case that

19   related to the fact that he released liens on certain

20   properties when he was paid the interest.  So we spent a lot

21   of time going back into countless amounts of real property

22   records to figure out where Mr. Halbert's liens were and then

23   charting out liens that were released against properties when

24   he received these interest payments because it wouldn't be a

25   defense to this case, we believe, even to the interest, if

1   Mr. Halbert was releasing good faith, valid liens that he had

2   on property of the debtor at the time he received the

3   interest payments.

4           So we spent a lot of time on that and a fair amount

5   of legal fees, only to go to the mediation and, at the

6   mediation, no one wanted to talk about Case A.  Instead, the

7   whole discussion at the mediation was, well, we can bring

8   Case B against Mr. Halbert if you don't want to pay the full

9   amount that we're suing you for in Case A.  Well, we thought

10  we had defenses for that.

11          And then we looked at the evidence that we can talk

12  about, that's being advanced against Mr. Halbert for this

13  Case B, which we'll take a look.  And again, I think it's

14  extremely weak to (indiscernible) be able to meet that

15  standard.  So we spent a lot of money looking at Case A.  Now

16  it didn't work out for the plaintiff in Case A, so they said,

17  well, we want to bring Case B, notwithstanding the fact that

18  it's time barred and it's not going to have any prejudicial

19  effect to you.  Well, it does because we didn't realize this

20  case was out there, and we probably wouldn't have spent a ton

21  of time, effort, and money defending Case A, had we known

22  that, really, this was all about Case B anyway.  So there is

23  an effect to that.

24          I hate to use, to be honest, you know, especially

25  amongst my colleagues, the trustee (indiscernible) a lot of

1    respect for (indiscernible) but I don't think it was good

2    faith to proceed down this mediation course when the only

3    thing that was ever discussed substantively about Case A was

4    the fact that Case B was out there, and there was a thirty-

5    seven-million-dollar ball hanging over Mr. Halbert's head if

6    he didn't resolve Case A, we were put in a -- really, in my

7    mind, a very tough situation.

8         And the reason the mediation -- the second

9    mediation was canceled was because we told the mediator that

10   we weren't going to come to the mediation and pay the full

11   amount of money on Case A.  And at that time, he came back to

12   me and said, well, then we shouldn't come forward because

13   that's the only way the other side will mediate.  So this has

14   always been an attempt to get Case B in the middle of Case A.

15   I don't think that's proper, I think we've been prejudiced by

16   it, and I don't think it's been, you know, good faith to see

17   this progress the way it has.

18        My final comments are to go to -- I'd like to just

19   point out the evidence that we have here, that we keep

20   hearing about.  And we keep hearing that Mr. Halbert is in

21   this class of one of the net winners that, upon review,

22   raised everybody's eyebrows so much.  One, I don't know what

23   happened in those other 400 cases that settled.  Many of

24   those cases may have settled because the trustee went to --

25   into those cases and said, hey, I got some Case B against you

1    and then settled Case A.  I think that could be certainly an

2    issue for evidentiary discovery that might need to be done,

3    you know, in connection with the motion.

4            But let's look at the evidence that they cite to,

5    in terms of support for this case.  This comes from their

6    papers.  They said that:

7            "During the course of litigating this adversary

8            proceeding, the trustee has recently learned that,

9            unlike typical Woodbridge investors, Halbert had a

10           close personal business relationship with Shapiro.

11           The trustee has uncovered emails in which Shapiro

12           refers to Halbert as "his good friend," and in

13           which Shapiro offers his vacation home rent-free to

14           Halbert's son.  In addition, numerous other email

15           evidence that Halbert had an open line of

16           communication with Shapiro regarding business

17           matters."

18           Well, when you go to these exhibits that they

19   produced of these emails, there was an email December 31st of

20   2014 that stated -- this is Exhibit D.  It said:

21           "Ken, hope all is well.  Just to let you know, Ivan

22           has left the co to pursue his own deal.  Feel free

23           to speak to my stepson Scott or Dane for any of

24           your structured settlement needs.  Scott or Dane" -

25           -

1              And they were copied on this email.

2              "-- take care of my good friend Ken Halbert.  Hope

3              you have a nice trip and a happy new year."

4              In response to that, Ken Halbert says:

5              "If you need anything, my direct line is 818-530-

6              0287."

7         Now that is supposed to tell us that Mr. Halbert

8    was somehow a bad faith material participant in a Ponzi

9    scheme that, on New Year's Eve, in a friendly email, someone

10   says take care of my good friend Ken Halbert.  Well, Ken

11   Halbert loaned $37 million to the company.  He probably was

12   his -- you know, he probably was a good friend, or at least

13   Bob Shapiro wanted to act like he was a good friend.  And

14   then Ken Halbert saying, if you need anything, here's my

15   direct line to call me is far from somebody saying, well,

16   there's open lines of communication for anything you need

17   ever.  I think that's just a -- you know, a friendly

18   exchange.

19        Then, in exhibit -- also in Exhibit D, we have the

20   -- an email about that condo, where the trustee, in his

21   pleadings, said that this condo was being offered free of

22   charge.  It says, on February 14th, 2016:

23             "Hi, Bob.  I'm sure you're having a great time in

24             Bora Bora.  A few times in the past, you offered

25             your condo to me in Aspen.  My son Jeff will be in

1            the area.  I was wondering if it's available,

2            either from February 20th through the 23rd or

3            February 25th through the 28th.  Thanks, Kenny."

4            To which it looks like Bob Shapiro responded:

5            "In Australia.  Bora Bora was great.  We have a

6            condo in Aspen he can use.  Copied Laura on this

7            email, and she can make arrangements for a key.

8            Laura will take care of you, my good friend Ken's

9            son."

10            Well, one, it looks like he uses the term "good

11 friend" when he describes anybody.  Two, there's nothing in

12 this that suggests that this condo was leased free of charge.

13 It just looks like that it was available in Aspen, and they

14 agreed to have his son use it.  If we would get into more

15 testimony, we would learn that, you know, that wasn't a

16 gratis situation.

17            And I only bring that -- those up because that's

18 the extent of this evidence that they're using to support

19 Case B.  Well, it's not very strong evidence.  And again, we

20 were put in a position to have to litigate Case A against

21 this Case B ball hanging over our head that contained these

22 kind of flimsy allegations of evidence.

23            So, look, I don't think that the amendment

24 necessarily would be futile because they're probably pleading

25 a cause of action that could possibly, if you take the

1    complaint on its face, sustain a motion to dismiss maybe.

2    And I'm not saying I wouldn't file one if leave is granted.

3    But I certainly don't think that, when you combine that all

4    together with all the other facts that we're looking at, that

5    we can't see a pattern of what's going on here:  The trustee

6    blew a statute of limitations and is trying to get it back

7    and hold it over our head to settle Case A, with the threat

8    that Case B may be looming.

9         So, for all those record -- reasons I stated, I

10   would ask that this --

11        THE COURT:  Well --

12        MR. CAROTHERS:  -- motion to amend be dismissed.

13   And I'll take any questions.

14        THE COURT:  I -- yeah, please.  So why can't -- why

15   shouldn't this be related back to the statute?

16        MR. CAROTHERS:  Well, I think it goes to, you know,

17   the same point I made earlier.  Case A, pretty simple, you

18   were shown some interest payments that you received.  And it

19   was asked that those payments be returned because this case

20   was a Ponzi scheme.  That case did say, okay, these interest

21   payments came from certain payments that were made, but it

22   never had any reference to the fact that they were going to

23   try to recover those principal payments, and it certainly did

24   not have anything in those pleadings that discussed that

25   there was going to be an attack on Mr. Halbert that would

1    basically put him almost in the same category as Mr. Shapiro,

2    that he was going to, you know, be accused of being a bad

3    faith participant in his investments, that he was, you know,

4    a glorified fraud, co-conspirator, maybe a criminal.  The

5    transactions are the evidence of maybe what the loss would

6    be.  But these are completely different types of allegations

7    that are used -- trying to utilize the same transactions to

8    hang on together.

9         But it's certainly one thing to come to me and say

10   you got some interest back from a Ponzi scheme and you were

11   an investor, you know, and by dumb luck you're going to have

12   to pay this back because the company, unbeknownst to you, was

13   a Ponzi scheme and there's a million dollars on the line.

14   And then go down to Case B and say you're a fraud, you

15   conspired, now you have all these damages.  I don't think

16   those are the spirit of same transactions or occurrences.  I

17   think this certainly would come as a surprise to anybody, if

18   they received one complaint that related to Case A, only to

19   find that, absent -- with the statute of limitations running,

20   they now would be guilty of the allegations in Case B, or be

21   subjected to those types of allegations.

22        THE COURT:  At this juncture, there's been no

23   discovery, there's been no motion practice, et cetera, right?

24   It's a -- we're at a clean slate, more or less.  Doesn't the

25   defendant still have the right, the opportunity to fully

1    defend the case and argue good faith as an affirmative

2    defense?

3         MR. CAROTHERS:  Sure.  And if the trustee sued Mr.

4    Halbert for something that he did in 1983, and it was allowed

5    to go forward, he would have the ability to come forward with

6    his defenses.  The distinction is that the case is now time-

7    barred, so it's a much different situation.  And Mr. Halbert

8    shouldn't be made to have to come forward and dispute this;

9    he should be able to raise the statute of limitations defense

10   to it.

11        THE COURT:  Do you think, under the law, that a

12   trustee is entitled to leeway?

13        MR. CAROTHERS:  I don't, Your Honor.

14        THE COURT:  Are you --

15        MR. CAROTHERS:  I mean, the trustee -- there's

16   nothing in the Bankruptcy Code that says -- and look, I

17   appreciate -- I represent trustees.  I appreciate the types

18   of burdens that you face when 19,000 boxes of documents are

19   delivered to you and you have to send 7 to Iron Mountain, and

20   you're looking at a two-year statute of limitations, and it's

21   driving you crazy that you're going to make it.  And you

22   don't want to file anything that's in bad faith, but at some

23   point, you have to make a call and a decision.

24        And the Bankruptcy Code nowhere says where a

25   trustee gets an extra period.  The trustee gets a two-year

1   period.  Whether that's right or wrong, I guess is a decision

2   for Congress to make, and they've made (indiscernible) case,

3   right?  So to try to expand that duty to (indiscernible)

4   trustee, it definitely faces, you know, some significant

5   burdens in these cases.  We've actually advanced the powers

6   of a trustee far beyond, you know, what any other litigant

7   would have.  And you know, that's not the law, and it

8   certainly wouldn't be fair to Mr. Halbert.

9           THE COURT:  Thank you.

10          And just, Mr. Carothers, I want to just clarify one

11  thing because I think the standard really has -- you referred

12  to four factors, and there are really five.  But I think the

13  fifth -- you're saying the factor, if the movant doesn't

14  provide a draft of the amended complaint, you're --

15          MR. CAROTHERS:  The movant --

16          THE COURT:  -- you just --

17          MR. CAROTHERS:  -- provided a very well drafted

18  complaint.

19          THE COURT:  Okay.  I just want to make sure that

20  the four factors that you had referred to were the first

21  four, and that you were just skipping over the fifth one.

22          MR. CAROTHERS:  I was.  Thank you, Your Honor.

23          THE COURT:  Okay.  No, no.  No problem.  I just

24  want to make sure the record is clear.  Thank you.

25          MR. PFISTER:  Thank you, Your Honor.  If I can

1  reply briefly?

2          THE COURT:  Yes.

3          MR. PFISTER:  Okay.  Let me give two -- make two

4  opening points and then hit a couple of key points that I

5  think Mr. Carothers -- that I need to address.

6          My first opening point is I think we're hearing a

7  slightly different argument than we heard in the opposition

8  brief, especially with respect to prejudice.  I just went

9  back and looked at the opposition brief.  I didn't see

10  anything about legal fees and releasing liens and the like.

11  I mean, the prejudice that is alleged in the opposition brief

12  is about the prejudice of litigating, you know, what they say

13  is a thirty-seven-million-dollar case.

14          I think one of Mr. Carothers' statements about, you

15  know, this isn't 37 million, this is the same money, you

16  know, he'd lend it, he'd get it back, he'd lend it, he'd get

17  it back, he'd lend it, he'd get it back, that's certainly a

18  fine argument for him to make when we're talking about which

19  transactions are shielded by good faith.  If he lent a

20  million, got back a million, and was in complete good faith,

21  that one is shielded.  If you lend a million, got back a

22  million, and was in complete good faith, that one is

23  shielded.  Maybe the last few are the ones where, you know,

24  he -- there's a potential issue there.  So, again, I think

25  that statement by Mr. Carothers, that characterization of the

1    transfers as not being $37 million lent, but rather being the

2    same money, you know, lent and returned, lent and returned,

3    lent and returned, I think that raises interesting issues as

4    to how exactly the 548(c) affirmative defense will come into

5    play.  But I think it highlights that this is not a question

6    of 1 million to 37 million.

7         The second opening point I'd like to make is the

8    mediation privilege.  Mr. Carothers made a number of

9    statements about what happened at mediation.  I don't think

10   that's appropriate, given the very strong shield of

11   mediation.  I was not present at any of the mediations, I

12   can't -- I wouldn't and I can't comment on anything that was

13   or was not said at a mediation.  But I don't think it's

14   appropriate to argue with respect to what happened at a

15   mediation and the like.

16        I think what is before the Court is that there was

17   an initial complaint filed.  There was a scheduling order

18   that deferred everything, in terms of actual litigation,

19   pending the parties' efforts at mediation.  The parties

20   attempted to mediate.  The mediation was not successful.  And

21   the trustee, thereafter, immediately filed a motion for

22   leave.  I think that's what's properly before the Court.

23        I don't think any questions about what was said or

24   was not said during the mediation process are really

25   appropriate for the core discussion.  And I am certain that,

1    if we were going to get into that, that the trustee's other

2    counsel who was present at the mediation would strongly

3    disagree with Mr. Carothers as to what was said.  But again,

4    I just don't think that's germane or relevant.

5              On the prejudice point, I did want to point Your

6    Honor specifically to the Dole case, Third Circuit 1990.

7    It's cited in Paragraph 14 of our reply.  It very clearly

8    says that the type of prejudice required to defeat an

9    amendment under Rule 15 is, quote:

10                   "A showing that the defendant was unfairly

11                   disadvantaged or deprived of the opportunity to

12                   present facts or evidence which it would have

13                   offered had the amendments been timely."

14              I left out some ellipses there.  But the point

15    being that the prejudice inquiry under Rule 15 -- and this

16    follows from the text of the original Cureton case that I

17    quoted about the delay must be prejudicial.  It's not the new

18    allegations must be prejudicial.

19              I think Mr. Carothers has a nice rhetorical point

20    on what he calls a "Case A" versus a "Case B."  It certainly

21    sounds nice.  But I think, when you look at the text of Rule

22    15, you'll see that that's not the standard.  And this goes

23    back to what I think is ultimately going to be the critical

24    factor here, which is the case that the trustee pled in his

25    initial complaint and the case the trustee pled in his

1   proposed amended complaint is the same case, in the sense of

2   it is an action to avoid and recover fraudulent transfers.

3        The -- what Mr. Carothers is talking about, in

4   terms of Case A versus Case B, is the answer that he is going

5   to proffer to that complaint and the defenses that he is

6   going to mount to that complaint.  But Rule 15, if you look

7   at its text, it refers to a pleading.  So Rule 15(a), "A

8   party may amend its pleading, and then it gets to, you know,

9   "as justice so requires."

10        Our pleading here is our affirmative request that

11   the -- affirmative attempt to avoid and recover transfers

12   that were made.  The only substantive change is, is that the

13   universe of those same transfers that were -- transfers of

14   both principal and interest have been included now, have been

15   expanded to include the principal components and not just the

16   interest components.

17        Mr. Carothers pointed out, you know, the trustee

18   sitting on, you know, boxes of documents and the like.  This

19   is not a case where we are proffering an amended complaint

20   that charges -- alleges that Mr. Halbert engaged in fraud by

21   any means.  That's not a complaint we are bringing, it's not

22   a complaint we're attempting to bring.  We're bringing the

23   same complaint for avoidance and recovery of fraudulent

24   transfers.  Mr. Carothers intends, as is his right, to

25   vigorously oppose the -- on the merits, using his 548(c)

1    affirmative defense -- and it's his burden to plead and prove

2    -- he plans to mount a different affirmative defense -- or a

3    different defense to that pleading.

4         But what is before the Court is not, in the

5    abstract, Case A versus Case B.  It is the trustee's original

6    complaint and the trustee's proposed amended complaint,

7    neither of which, either do, or obligated to alleged,

8    affirmatively a lack of good faith on Mr. Halbert's part

9    because that is his burden to plead and prove that.  So,

10   again, I think it's a nice rhetorical point, but I don't

11   think it actually takes you anywhere.

12        And then, finally, in terms of this -- in terms of

13   attempting to parse through the evidence that the trustee

14   proffered with the motion to amend as to why we now believe

15   that Mr. Halbert may not take advantage of the good faith

16   defense.  First of all, it wasn't done in the opposition

17   brief.  Mr. Halbert point -- picked out the good friend

18   emails and the lending -- you know, the son -- or lending the

19   house to him in Aspen emails.

20        It's actually far more damning than that.  Again,

21   the business about he understood or he knew or should have

22   known -- which, by the way, should have known is sufficient

23   to defeat affirmative -- a good faith affirmative defense --

24   you know, that the signatory on the Owlwood property entity

25   was, in fact, Robert Shapiro and was not a bonafide third-

1   party buyer; and then that his son entered into a finder's

2   fee agreement to find a bonafide third-party buyer for

3   Owlwood.  Those are far, far more damning than, you know, my

4   good friend and the house.

5        All of that, however -- and I'll close with where I

6   started.  All of that is not before the Court.  The Court is

7   not holding a mini-trial right now on did Ken Halbert act in

8   good faith.  That is not what is before the Court.  The Court

9   is -- has before it a motion to amend.  Under Rule 15(a), the

10  standard is leave shall be freely amend [sic] as justice

11  requires.  There are the four factors from Cureton, we've

12  gone through them at great length.

13        I think Mr. Carothers' primary argument about

14  statute of limitations, that's a Rule 15(c) issue, that's not

15  a Rule 15(a) issue.  And that argument would be precisely the

16  same as if the trustee had filed this initial amended

17  complaint on December 8th of 2019, right?  He filed the

18  initial complaint on December 1, within the statute of

19  limitations, of 2019.  Had he then filed the amended

20  complaint on December 8th of 2019, seven days later, just

21  past the statute of limitations, it's the same test under

22  Rule 15(c).  Does it arise out of the same transaction --

23  conduct, transaction, or occurrence set out in the initial

24  pleading or attempted to be set out in the initial pleading.

25  So, again, I understand the desire to conflate the Rule 15(c)

1    issue and the Rule 15(a) issue, but they are not the same.

2    What's before the Court is the request to amend.  I believe

3    that request is well taken.

4           And the issue of relation back, I don't think the

5    Court has to address it now, I think the Court can address it

6    now.  I maintain that it -- that we -- it's difficult to see

7    a clearer instance of something arising out of the same

8    conduct, transaction, or occurrence when you're talking about

9    principal payments and interest payments, but that's the

10   change.  The change is not Mr. Halbert is a fraudster.  The

11   change is we are seeking to recover funds that were

12   transferred to Mr. Halbert.  He is entitled to mount defenses

13   to those claims, and we are entitled, under the rules, to

14   seek leave to amend those claims.

15          So, with that, Your Honor, I think, if -- unless

16   the Court has any questions, I'll conclude.

17          THE COURT:  Thank you.  No, I -- is there anything

18   further?

19      (No verbal response)

20          THE COURT:  Okay.  I am going to take this matter

21   under advisement.  We'll be in contact with the parties.

22   Thank you very much for your helpful arguments today.  Have a

23   great day.  We stand adjourned.

24          MR. PFISTER:  Thank you.

25      (Proceedings concluded at 4:36 p.m.)

1                            CERTIFICATION

2            I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10

11    _____    October 27, 2021

12    Coleen Rand, AAERT Cert. No. 341

13    Certified Court Transcriptionist

14    For Reliable