## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------x
                                         :
In re:                                   :        Chapter 11
                                         :
WOODBRIDGE GROUP OF                      :        Case No. 17-12560 (JKS)
COMPANIES, LLC, et al.,¹                 :
                                         :        (Jointly Administered)
              Remaining Debtors.         :
                                         :
-------------------------------------------------x
MICHAEL GOLDBERG, in his capacity as     :
Liquidating Trustee of the               :
Woodbridge Liquidation Trust,            :
                                         :
              Plaintiff,                  :        Adv. Proc. No. 19-51027 (JKS)
                                         :
v.                                       :        Reference D.I. Nos. 53, 59, 62, 74, 81
                                         :
KENNETH HALBERT,                         :
                                         :
              Defendant.                 :
-------------------------------------------------x
```

## MEMORANDUM OPINION

Before the Court is a motion to amend a complaint in an adversary proceeding arising

from a Ponzi scheme bankruptcy. After confirmation of a plan of liquidation, the liquidating

trustee filed a complaint seeking to avoid prepetition transfers of fictious profits to one of the

scheme's investors. Approximately 20 months later, the liquidating trustee moved to amend the

complaint to recover prepetition transfers of principal repayments to the same investor. For the

reasons explained below, justice requires the Court grant leave to amend.

---

¹ The Remaining Debtors and the last four digits of their respective federal tax identification numbers are as follows: Woodbridge Group of Companies, LLC (3603) and Woodbridge Mortgage Investment Fund 1, LLC (0172). The Remaining Debtors' mailing address is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423.

## Background[2]

### I.    The Woodbridge Ponzi Scheme

Woodbridge Group of Companies, LLC and various affiliates (collectively, "Woodbridge" or the "Debtors") were operated by founder, Robert Shapiro, as part of a Ponzi scheme (the "Woodbridge Ponzi Scheme").[3]  Between 2012 and 2017, the Woodbridge Ponzi Scheme raised over one billion dollars from approximately 10,000 investors.[4]

The Woodbridge Ponzi Scheme primarily raised money through the sale of fraudulent securities, including purportedly secured notes.[5]  Funds raised from the sales of the notes were supposed to be lent to third parties for the purchase of real properties that would collateralize the notes.[6]  Instead, the funds were used to pay principal and interest due on previously issued securities, and the real properties were purchased by affiliates of Mr. Shapiro.[7]  By late 2017, Mr. Shapiro was under investigation by the Securities and Exchange Commission and state regulatory agencies.[8]  These investigations interfered with Woodbridge's ability to attract sufficient new investment, and the Woodbridge Ponzi Scheme collapsed.[9]

### II.    The Woodbridge Bankruptcy

On December 4, 2017 (the "Initial Petition Date"), Woodbridge filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code; additional affiliates filed petitions the

---

[2] References to the docket in this adversary proceeding, *Goldberg v. Halbert*, Adv. Proc. No. 19-51027 (JKS), are cited as "Adv. D.I."  References to the docket in the bankruptcy case, *In re Woodbridge Group of Companies, LLC, et al.*, Case No. 17-12560 (JKS), are cited as "D.I."

[3] *Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors*, D.I. 2903 (the "Confirmation Order") ¶ NN.  *See also Opinion on Confirmation* 2–3, D.I. 2901 (the "Confirmation Opinion").

[4] *Liquidation Trust's Status Report for May 19, 2021 Status Conference*, Adv. D.I. 46 (the "May 5th Status Report") ¶ 1.

[5] May 5th Status Report ¶ 3.

[6] *Id.*

[7] *Id.* ¶¶ 4–5.

[8] *Id.* ¶ 6.

[9] *Id.*

following year.[10]  On October 26, 2018, the Court entered the Confirmation Order confirming

the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies,*

*LLC and its Affiliated Debtors* (the "Plan").[11]  The Confirmation Order contained a finding that

Woodbridge was operated as part of a Ponzi scheme (the "Ponzi Scheme Finding").[12]  The Plan

provided for the creation of a liquidation trust (the "Trust") on the effective date (the "Effective

Date") to pursue, among other things, avoidance actions on behalf of trust beneficiaries (the

"Trust Beneficiaries").[13]  The Effective Date occurred on February 15, 2019.[14]

The Trust Beneficiaries include prepetition holders of Woodbridge's fraudulent

securities[15] who did not recover the entirety of their principal investment in Woodbridge before

the Initial Petition Date, in other words, the "net losers" of the Woodbridge Ponzi Scheme.[16]  In

contrast, investors who received more than their principal investment in prepetition cash

transfers, "net winners," are not Trust Beneficiaries.[17]  The payments that net winners received in

---

[10] Original Compl. ¶ 7, Adv. D.I. 1.  Additional affiliates filed petitions on February 9, 2018, March 9, 2018, March 23, 2018, and March 27, 2018.  Confirmation Opinion 2.  The Original Complaint calculates relevant dates using the Initial Petition Date.  *See* Original Compl. ¶ 16.

[11] D.I. 2903 Ex. 1.

[12] The Confirmation Order contained the following finding, establishing that Woodbridge was operated as part of a Ponzi Scheme:

> The evidence demonstrates, and the Bankruptcy Court hereby finds, that (i) beginning no later than July 2012 through December 1, 2017, Robert H. Shapiro used his web of more than 275 limited liability companies, including the Debtors, to conduct a massive Ponzi scheme raising more than $1.22 billion from over 8,400 unsuspecting investors nationwide; (ii) the Ponzi scheme involved the payment of purported returns to existing investors from funds contributed by new investors; and (iii) the Ponzi scheme was discovered no later than December 2017.

Confirmation Order ¶ NN.  *See also* Confirmation Opinion 2–3.

[13] Plan § 5.4.4.  The Plan refers to beneficiaries of the Liquidation Trust as "Liquidation Trust Beneficiaries." Plan § 1.79.

[14] D.I. 3421.

[15] May 5th Status Report ¶ 13; Plan §§ 3.4–6.

[16] May 5th Status Report ¶ 15.

[17] The Plan provides that holders of Woodbridge's fraudulent securities would receive interests in the Trust in the amount of their net claims.  Plan §§ 3.4–5.  Net claims were determined by subtracting any prepetition distributions holders received from their principal investments in Woodbridge.  Plan §§ 1.89–90; *see also* Confirmation Opinion.

excess of their principal investment are referred to as "fictious profits" and are subject to claw back through avoidance actions.

After the Effective Date, the Liquidating Trustee of the Trust (the "<u>Trustee</u>") filed 425 adversary complaints against net winners.[18]  In these complaints, the Trustee did not seek to avoid prepetition principal repayments to net winners, only fictitious profits.[19]  Had the Trustee sought to recover the principal repayments each net winner had invested, each net winner defendant would have been required to plead the good faith affirmative defense (the "<u>Good Faith Affirmative Defense</u>") of section 548(c) of the Bankruptcy Code and analogous state law, and prove they acted in good faith, in order to retain prepetition repayments of principal.[20]  The Trustee presumed each net winner defendant acted in good faith and declined to pursue principal repayments in the net winner adversary proceedings rather than requiring hundreds of misled investors to raise and litigate the Good Faith Affirmative Defense.[21]

## III.    The Adversary Proceeding

On December 1, 2019, the Trustee filed one such net winner complaint[22] (the "<u>Original Complaint</u>") against Kenneth Halbert to avoid prepetition payments of profits on prepetition "bridge loans" Mr. Halbert had extended to the Debtors which were repaid in full before the Initial Petition Date.[23]  Like the other net winner adversary complaints, the Original Complaint only sought to avoid fictious profits paid to Mr. Halbert in the form of interest on the loans in the amount of $1,678,583.38.[24]

---

[18] Reply ¶ 16; Tr. 13:20.  The Trustee pursued approximately 675 potential defendants but resolved 250 claims without initiating litigation.  Tr. 13:14–16.
[19] Tr. 11:6–20.
[20] *Id.* 10:20–25, 11:1–20.
[21] Reply 3.
[22] Original Compl. ¶ 5.
[23] *Id.* ¶ 5.
[24] *Id.* ¶¶ 1–2 (Prayer for Relief).

On January 15, 2020, Defendant filed an answer to the Original Complaint.[25]  The case was assigned to mediation[26] pursuant to an agreed scheduling order (the "Scheduling Order").[27] Mediation has been unsuccessful.[28]  No discovery or dispositive motion practice has occurred.[29]

## IV.    The Motion for Leave to Amend

On July 12, 2021, the Trustee filed *Plaintiff's Motion for Leave to File Amended Complaint* (the "Motion"),[30] which attached the proposed amended complaint (the "Proposed Amended Complaint").[31]  Accompanying the Motion was the *Declaration of Thomas P. Jeremiassen in Support of Plaintiff's Motion for Leave to File Amended Complaint* (the "Jeremiassen Declaration").[32]

The Jeremiassen Declaration included as exhibits various emails between Messrs. Halbert and Shapiro.[33]  The Jeremiassen Declaration also included a demand promissory note (the "Promissory Note") between Mr. Halbert, as payee, and Sturmer Pippin Investments, LLC, as maker.  Sturmer Pippin Investments, LLC was the owner of the Owlwood Estate, which was Woodbridge's flagship property.[34]  Mr. Shapiro signed the Promissory Note as manager of Sturmer Pippin Investments, LLC, even though Woodbridge purported to make loans to third parties for the purchase of real estate.[35]

---

[25] Adv. D.I. 4.
[26] Adv. D.I. 27.
[27] Adv. D.I. 23.
[28] A Mediator's Certificate of Completion has not yet been filed.
[29] Under the Scheduling Order, all formal discovery between the parties, including, but not limited to the service of initial disclosures under Fed. R. Civ. P. 26(a)(1), is tolled until after the filing of the Mediator's Certificate of Completion pursuant to Local Rule 9091–5(f)(ii).  Scheduling Order ¶ 5.
[30] Adv. D.I. 53.
[31] Mot. Ex. 1.
[32] *Id.*
[33] Jeremiassen Decl. ¶¶ 8–12.
[34] *Id.* ¶ 16.
[35] *Id.*

Based on Mr. Shapiro's signature on the Promissory Note on behalf of Sturmer Pippin Investments, LLC—suggesting that the Owlwood Estate was owned by an affiliate of Mr. Shapiro rather than a true third party borrower—and customized loan documentation provided to Mr. Halbert, as well as the other exhibits to the Jeremiassen Declaration, the Trustee asserts that Mr. Halbert was aware of the "central lie"[36] of the Woodbridge Ponzi Scheme and likely was not a good faith investor who could successfully raise the Good Faith Affirmative Defense (a "Good Faith Investor").[37]  Accordingly, the Proposed Amended Complaint also seeks to avoid principal repayments (the "New Transfers"), in addition to fictitious profits, in the aggregate amount of $38,424,675.31.[38]

On August 2, 2021, Mr. Halbert filed *Defendant Kenneth Halbert's Opposition to Plaintiff's Motion for Leave to File Amended Complaint*[39] (the "Opposition"), and on August 16, 2021, the Trustee filed a reply (the "Reply").[40]  At the request of the parties,[41] oral argument was held on October 19, 2021.[42]  Following oral argument, *Defendant Kenneth Halbert's Ex Parte Motion for Leave to File Post-Oral Argument Summary* was filed[43] along with *Defendant Kenneth Halbert's Post-Oral Argument Summary* (the "Defendant's Summary").[44]  In response, the Trustee filed *Plaintiff's Objection to Defendant Kenneth Halbert's Ex Parte Motion for Leave to File Post-Oral Argument Summary*.[45]  On November 9, 2021, the Court entered an

---

[36] Proposed Amended Compl. ¶¶ 19–20.

[37] Tr. 15:1–8.  To be clear, the Trustee's allegation in the Motion that Mr. Halbert lacked good faith does not preclude Mr. Halbert from raising the Good Faith Affirmative Defense.  The Trustee's allegation means that, if leave to amend is granted, Mr. Halbert's good faith must be litigated, whereas it was assumed under the Original Complaint.

[38] Proposed Amended Compl. ¶¶ 47–50.

[39] Adv. D.I. 59.

[40] Adv. D.I. 62.

[41] Adv. D.I. 63–64.

[42] The oral argument transcript (the "Transcript") is Adv. D.I. 76.

[43] Adv. D.I. 75.

[44] Adv. D.I. 74.

[45] Adv. D.I. 77.

order permitting the Defendant to file the Defendant's Summary (the "Summary Order").[46]  On

November 16, 2021, the Trustee filed *Plaintiff's Response to Defendant Kenneth Halbert's Post-*

*Oral Argument Summary* (the "Trustee's Summary").[47]

## Jurisdiction

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28

U.S.C. § 1134(b).  This adversary proceeding is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## Standard of Review

Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, made applicable by

Bankruptcy Rule 7015,[48] after the time for amendment as a matter of course has expired, "a party

may amend its pleading only with the opposing party's written consent or the court's leave.  The

court should freely give leave when justice so requires."[49]

Rule 15 reflects a "liberal pleading philosophy" that generally favors amendment.[50]  The

Third Circuit has adopted a liberal approach to the amendment of pleadings to ensure that "a

particular claim will be decided on the merits rather than on technicalities."[51]  Under this

approach, a mistake should not necessarily preclude a party from obtaining relief on the merits of

---

[46] Adv. D.I. 79.

[47] Adv. D.I. 81.

[48] Fed. R. Bankr. P. 7015.

[49] Fed. R. Civ. P. 15(a)(2).

[50] *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001); *see also Arthur v. Maersk, Inc.*, 434 F.3d 196, 206 (3d Cir. 2006) ("The liberality of Rule 15(a) counsels in favor of amendment even when a party has been less than perfect in the preparation and presentation of a case.") (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989) ("We have noted that the courts 'have shown strong liberality . . . in allowing amendments under Rule 15(a).'") (quoting *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing*, 663 F.2d 419, 425 (3d Cir. 1981)); *Dole v. Arco Chemical Co.*, 921 F.2d 484, 486 (3d Cir. 1990) (observing that Rule 15(a) "embodies a liberal approach to amendment . . . .").

[51] *Dole*, 921 F.2d at 487 (internal citations omitted).

a claim.[52]  Good-faith lapses in judgment and misunderstandings may be corrected through amendment, as long as the movant acts diligently and reasonably.[53]

Whether to grant leave to amend is within the discretion of the court but should be freely given unless equitable considerations counsel against it.[54]  The court may consider a "broad range of equitable factors" in considering whether leave should be granted.[55]  This Court weighs five equitable factors considered by the Third Circuit in *Cureton v. N.C.A.A.* to determine whether to grant leave to amend: undue delay, bad faith, substantial or undue prejudice to the opposing party, failure to provide an amended complaint and futility.[56]  The parties agree that *Cureton* provides the controlling standard.[57]

## Discussion

### I.    Undue Delay

"The 'undue delay' factor recognizes that a gap between when amendment becomes possible and when it is actually sought can, in certain circumstances, be grounds to deny leave to amend."[58]  Delay alone, however, is insufficient to deny a motion to amend.[59]  Because there is no set length of time in which delay becomes undue,[60] "the question of undue delay requires that

---

[52] *See Arthur*, 434 F.3d at 202 (citing *Foman*, 371 U.S. at 182) (noting that, together, Rules 15(a) and 15(c) "ensure that an inadvertent error in pleading will not preclude a party from securing relief on the merits of a claim.").

[53] *Id.* at 206 (citing *Adams v. Gould, Inc.*, 739 F.2d 858, 868–69 (3d Cir. 1984); 6A Charles Alan Wright et al., Federal Practice and Procedure § 1488 (2d ed. 1990)).

[54] *Foman*, 371 U.S. at 182–83.

[55] *Arthur*, 434 F.3d at 203 (internal citations omitted).

[56] *Cureton*, 252 F.3d at 273; *see, e.g.*, *MagSil Corp. v. Seagate Tech.*, No. CIV. A. 08-940, 2010 WL 2710472, at *2, 2010 U.S. Dist. LEXIS 67547, at *4, 6 (D. Del. Jul. 7, 2010) (applying *Cureton* and denying leave to amend); *Mylan Pharms., Inc. v. Kremers Urban Dev. Co.*, No. 02-1628 GMS, 2003 WL 22711586, at *2, 5, 2003 U.S. Dist. LEXIS 20665, at *7 (D. Del. Nov. 14, 2003) (citing *Foman* and *Cureton* for four-factor test (exclusive of failure to attach proposed amended complaint) for Rule 15(a) analysis).

[57] Trustee's Summary ¶ 1 ("Both parties agree that Cureton governs . . . ."); *see also* Defendant's Summary ¶ 9; Tr. 7:1–21, 19:2–6, 26:1–16, 40:11–19.

[58] *Mullin v. Balicki*, 875 F.3d 140, 151 (3d Cir. 2017).

[59] *Cureton*, 252 F.3d at 273 (citing *Cornell & Co., Inc. v. Occupational Safety & Health Review Comm'n.*, 573 F.2d 820, 823 (3d Cir.1978)).

[60] *Mullin*, 875 F.3d at 151 (citing *Maersk*, 434 F.3d at 205).

[the court] focus on the movant's reasons for not amending sooner."[61]  Delay may become undue

when, for example, a movant had prior opportunities to amend a complaint or a proposed

amended complaint repleads facts that could have been pleaded earlier.[62]  To demonstrate that

delay is not undue, the movant must articulate a "colorable excuse" for the delay.[63]

A.    The Parties' Arguments Regarding Undue Delay

The Trustee offers two explanations for the delay.  First, the Trustee asserts that he did

not discover that Mr. Halbert knew of Mr. Shapiro's fraud and thus was not entitled to the Good

Faith Affirmative Defense until he conducted a targeted review of records in connection with

mediation.[64]  Although the documents became available to the Trust on the Effective Date, the

delay in review, the Trustee explains, was partly due to the large volume of documents in the

Trust's possession.[65]  Second, the Trustee argues that the agreed Scheduling Order forestalled

litigation.[66]  Had litigation and the filing of initial disclosures proceeded earlier, the Trustee says

---

[61] *Cureton*, 252 F.3d at 273 (citing *Adams*, 739 F.2d at 868).

[62] *Id.*; *see also Jang v. Bos. Sci. Scimed, Inc.*, 729 F.3d 357, 368 (3d Cir. 2013) ("Delay may become undue 'when a movant has had previous opportunities to amend a complaint' but instead 'delays making a motion to amend until after [judgment] has been granted to the adverse party,' and when 'allowing an amendment would result in additional discovery, cost, and preparation to defend against new facts or new theories.'") (citing *Cureton*, 252 F.3d at 273).

[63] *See Arthur*, 434 F.3d at 205 & n.11 (3d Cir. 2006) (citing *Adams*, 739 F.2d at 867–68).

[64] It is not clear, based on the Trustee's statements, exactly when, relative to the first session of mediation, he reviewed the documents that were attached to the Jeremiassen Declaration, and specifically whether he discovered them before or after mediation. *Compare* Mot. ¶ 3 ("*During the course of litigating* this Adversary Proceeding, the Trustee *has recently learned* that, unlike the typical Woodbridge investor, Halbert had a close personal and business relationship with Shapiro.") (emphasis added), *and* Mot. ¶ 15 ("The Trustee *has recently uncovered* emails in which Shapiro refers to Halbert as his 'good friend,' and in which Shapiro offers his vacation home, rent-free, to Halbert's son.") (emphasis added), *with* Reply ¶ 19 ("*During the course of the mediation process*, it is not uncommon for parties to undertake further investigation of materials in their possession.  *The Trustee did so*, and ultimately discerned based on the records in his possession that there are serious questions as to Halbert's good faith.") (emphasis added), *and* Tr. 22:9–16 ("And *as part of that process of preparing*, getting ready, and deciding how to proceed *with respect to mediation, that is when the trustee became aware . . . .*") (emphasis added).  Even if the newly discovered facts were brought up for the first time in mediation before the Trustee moved to amend, this would not constitute undue delay or bad faith.

[65] Tr. 24:4–13.

[66] Reply ¶ 5.  The other argument advanced in this paragraph, that, "Halbert is no worse off as a result of the Trustee's challenge to principal repayments having been made 19 months after the Original Complaint than Halbert would have been had that same challenge been made in the Original Complaint itself" goes to prejudice rather than undue delay.  *Id.*

he likely would have moved to amend earlier.[67]  The Trustee maintains that after discovering this information he moved to amend promptly.[68]

In opposition, the Defendant claims that the Trustee's professionals possessed the documents underlying the claims in the Proposed Amended Complaint since at least February 15, 2018,[69] and consequently should have sought amendment earlier or included the New Transfers in the Original Complaint.[70]  The Defendant also argues that the Trustee's delay in amending the Original Complaint is due to a "calculated decision not to include the New Transfers" in the Original Complaint.[71]  It would be unfair, the Defendant argues, to allow the Trustee to revisit his decision and amend the Original Complaint to seek principal repayments.[72]

B.    The Trustee's Delay in Moving to Amend Was Not Undue

The Trustee's first explanation, that the volume of records in his possession accounted for the delay, is persuasive and has been previously recognized as a colorable excuse.[73]  The Defendant's argument about the Trustee's prior possession of the documents is thus unavailing. The Defendant's prior possession argument also misses the point of the leave-to-amend analysis: The question is not whether the Trustee could have pleaded the amended allegations in the Original Complaint.  Rather, it is whether the Trustee should have moved to amend earlier.  The Trustee had no reason to scrutinize every document in his possession earlier than he did because,

---

[67] *Id.* ¶ 10.

[68] Mot. ¶ 23.

[69] Opp'n ¶ 19.

[70] *See id.* ¶ 20.

[71] Opp'n ¶ 19.

[72] Tr. 52:24–25; 53:1–8; *see also* Defendant's Summary ¶ 13 ("This simply is just Plaintiff saying it did not want to review its documents at that time.").

[73] *See Le v. City of Wilmington*, CIV NO. 08-615-LPS, 2010 WL 2754253, at *3, 2010 U.S. Dist. LEXIS 69038, at *7 (D. Del. Jul. 12, 2010) ("Defendants have articulated a colorable excuse for the delay, as the ten to twelve screen shots that provide the basis for the proposed amendment were difficult to locate amidst Defendants' electronic document production of more than 55,000 pages.").

as the Trustee correctly points out, the Scheduling Order forestalled discovery.  Managing one's

time in compliance with a scheduling order is not undue delay.

The Defendant's statement that the delay resulted from the Trustee's calculated decision

to presume good faith is accurate, but such delay is not undue.  The Trustee acknowledges that

he assumed the good faith of all 675 potential defendants to minimize costs and streamline

litigation, rather than litigate the Good Faith Affirmative Defense in each net winner lawsuit.[74]

The Trustee's choice to assume good faith, given the volume of net winner defendants, was

sensible and appropriate under the facts of this case.  Proceeding in this manner reduced costs

and facilitated settlements for the benefit of Trust Beneficiaries.  The decision also protected net

winners, most of whom are victims of the Ponzi scheme, from unnecessary litigation.  The

Trustee's efficient management of the litigation also promoted judicial economy.  Having

learned that the Good Faith Affirmative Defense might not apply to the Defendant, the Trustee

moved to amend in furtherance of his fiduciary duties.[75]

These facts do not establish undue delay, particularly under the circumstances of a Ponzi

scheme bankruptcy, which requires mass net winner litigation to achieve equitable distribution.

## II.    Prejudice

To establish prejudice, the non-movant "must show that it was unfairly disadvantaged or

deprived of the opportunity to present facts or evidence which it would have offered had the . . .

amendments been timely."[76]  In assessing prejudice, the court considers whether permitting

---

[74] Mot. ¶ 19 ("[T]he Trustee made the sensible and appropriate initial choice to assume that all of the net winners were acting in good faith and should not be subjected to an initial complaint seeking recovery of both interest and principal when in all likelihood they had an iron-clad affirmative defense that would shield the repayment of invested principal."); Tr. 13:5–9 ("So that is really an appropriate way of proceeding, the decision not to assume that everybody acted in bad faith, but instead to proceed on the assumption and to seek recovery of the fictitious profits only.").

[75] *See* Tr. 11:18.

[76] *Bechtel*, 886 F.2d at 652 (quoting *Heyl & Patterson Int'l*, 663 F.2d at 426) (internal quotations omitted).

amendment would result in additional cost, discovery, or preparation in defense of new legal theories or facts.[77] The "mere allegation of prejudice" and "the possibility that some additional discovery will be required" are insufficient to show prejudice.[78]

A.    The Parties' Arguments Concerning Prejudice

The Trustee maintains that Mr. Halbert is not prejudiced by the amendment because his legal position has not worsened with the passage of time.  Mr. Halbert's defenses to the Proposed Amended Complaint, the Trustee asserts, are the same today as they would have been had the Proposed Amended Complaint been filed on December 1, 2019, in lieu of the Original Complaint.[79]  Since that date, no evidence or witnesses have become unavailable.[80]  Moreover, since all discovery has been tolled, the Defendant "will have a full and fair opportunity" to defend against the claims in the Proposed Amended Complaint and establish the Good Faith Affirmative Defense.[81]

The Defendant's primary argument for prejudice is that the Proposed Amended Complaint will require a costlier defense owing to the immense increase in potential liability and involve different defenses than the Original Complaint.[82]  Mr. Halbert's potential liability increased in the Proposed Amended Complaint by nearly $37 million—an increase more than twenty-two fold.[83]  The Defendant also argues that he spent significant legal fees investigating the defense that he released in good faith valid liens on property of Woodbridge in exchange for

---

[77] *Cureton*, 252 F.3d at 273.
[78] *Dasso Int'l, Inc., v. MOSO N. Am., Inc.*, C.A. No. 17-1574-RGA, 2020 WL 6287673, at *4, 2020 U.S. Dist. LEXIS 199505, at *11, (D. Del. Oct. 27, 2020) (citing *Dole*, 921 F.2d at 488).
[79] *See supra* note 64.
[80] Tr. 28:7–8; *see also* Reply ¶ 14.
[81] Mot. ¶¶ 7, 22.
[82] Opp'n ¶¶ 23, 24.
[83] *Id.* ¶ 23.

12

certain of the interest payments described in the Original Complaint.[84]  This defense, the

Defendant asserts, would not be applicable against the Proposed Amended Complaint,[85]

presumably because the Trustee no longer assumes Mr. Halbert was a Good Faith Investor.[86]

Mr. Halbert also argues that "mediation of the $1 million claim, absent discovery on the entire

case, would not have been considered" had he known he might be liable to the much greater

extent pleaded in the Proposed Amended Complaint.[87]

   B.  <u>There Is No Prejudice</u>

   Although the Proposed Amended Complaint may require a costlier defense than the

Original Complaint, this is not prejudice.  Prejudice is "damage or detriment to one's legal rights

or claims."[88]  Mr. Halbert's rights and defenses against the claims raised in the Proposed

Amended Complaint, as the Trustee correctly points out, are no worse today than they would

have been had the Trustee filed the Proposed Amended Complaint in lieu of the Original

Complaint.  Because Mr. Halbert's rights and defenses against the claims remain fully available,

the substantial increase in Mr. Halbert's potential liability is not prejudicial: The Scheduling

Order's tolling of litigation has fully preserved Mr. Halbert's ability to conduct discovery and

present facts or evidence to defend against the new allegations.  Mr. Halbert is not precluded or

prejudiced from defending against the Proposed Amended Complaint on the merits.

   The Defendant's prior investigation of his liens does not establish prejudice.  The

Defendant undertook that investigation voluntarily before the commencement of discovery.  At

---

[84] Tr. 44:15–25; Defendant's Summary ¶ 14 ("This endeavor cost Halbert substantial amounts of time and over $30,000 in legal fees.").
[85] Tr. 44:24–25.
[86] This argument was raised for the first time at oral argument.  Tr. 54:6–13.  The Defendant's Summary also discusses the previous lien research but does not explain how it is no longer applicable against the allegations in the Proposed Amended Complaint.  Defendant's Summary ¶ 14.
[87] Defendant's Summary ¶ 15.
[88] *Prejudice*, *Black's Law Dictionary* (11th ed. 2019).

such an early phase in litigation, amendment of the complaint is always a possibility.  There is no reason to believe, moreover, that Mr. Halbert's lien investigation is less applicable to the Proposed Amended Complaint than the Original Complaint.  Furthermore, that Mr. Halbert would not have considered mediation had he known the Trustee would pursue the claims in the Proposed Amended Complaint "absent discovery on the entire case," is not prejudice.  Mr. Halbert is not bound by any legal positions taken in mediation in response to the Original Complaint.  Litigation remains fully available to Mr. Halbert.

For these reasons, granting the Motion would not result in substantial or undue prejudice to Mr. Halbert.

## III.    Bad Faith

Inquiries into bad faith require the court to consider the plaintiff's motives for not having amended the complaint sooner.[89]  In determining whether a motion to amend is brought in bad faith, the court's inquiry is limited to "whether the motion to amend itself is being made in bad faith, not whether the original complaint was filed in bad faith or whether conduct outside the motion to amend amounts to bad faith."[90]  Bad faith is found where, for example, a movant callously disregards professional responsibilities in connection with failing to amend promptly.[91]

### A.    The Parties' Arguments Regarding Bad Faith

The Trustee denies the Motion was filed in bad faith, arguing that the adversary proceeding has been litigated in the same manner as hundreds of other net winner adversary proceedings, except that "the good faith of Defendant here, unlike the good faith of the

---

[89] *Adams*, 739 F.2d at 868.
[90] *Trueposition, Inc. v. Allen Telecom, Inc.*, C.A. No. 01-823 GMS, 2002 WL 1558531, at *2, 2002 U.S. Dist. LEXIS 12848, at *5, (D. Del. Jul. 16, 2002) (citing *J.E. Mamiye & Sons, Inc v. Fidelity Bank*, 813 F.2d 610, 614 (3d Cir. 1987)).
[91] *See Sweeney v. St. Joseph's Hosp.*, 769 F. Supp. 747, 750 (M.D. Pa. 1991) (citing *Nat'l Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976)), *aff'd*, 980 F.2d 724 (3d Cir. 1992).

defendants in those other matters, is uniquely suspect – a fact the Opposition never denies."[92]
The Trustee contends that "treating differently situated defendants differently is not bad faith
[and] neither is proceeding with litigation when mediation is not successful."[93]

The Defendant argues that the Motion has been brought in bad faith for three reasons.
First, the Defendant asserts that the Motion is based on purported facts that have been in
Trustee's possession for years and was only filed after the parties failed to resolve the Original
Complaint amicably.[94]  Second, the Trustee filed the Motion, the Defendant claims, to "increase
the costs of this case and create fear of astronomical claims."[95]  Third, the Defendant alleges that
it was bad faith for the Trustee to attempt to procure a settlement for the total amount alleged in
the Original Complaint by essentially threatening in mediation to amend the Original Complaint
to claw back principal repayments.[96]

## B.    The Motion Has Not Been Brought in Bad Faith

Although delay can constitute bad faith, the Trustee's prior possession of the documents
attached to the Jeremiassen Declaration does not establish that he should have moved to amend
sooner, as explained above.[97]  With respect to the Defendant's second and third arguments, the
Court sees no support for these assertions.  Attempting to establish bad faith, the Defendant
relies on statements purportedly made during mediation, but the disclosure of these statements
violates Local Rule 9019-5(d)(i).[98]  Based solely on the statements properly before the Court,[99] it

---

[92] Reply ¶ 6.
[93] *Id.* (cleaned up).
[94] Opp'n ¶ 27; Defendant's Summary ¶ 17.
[95] Opp'n ¶ 27.
[96] Tr. 45:4–25; 46:1–17.
[97] *See supra* pp. 11–12.
[98] Del. Bankr. L.R. 9019-5(d); *see also* Summary Order ¶ 4.
[99] The statements of defense counsel at oral argument and in the Defendant's Summary divulging information from mediation have been deemed stricken.  Summary Order ¶ 4.

appears that the parties participated in mediation and, after failing to reach a settlement, the

Trustee moved to amend the Original Complaint.  On its face, the Trustee's request does not

suggest bad faith.

      For these reasons, the Motion was not brought in bad faith.

## IV.    Futility

      Amendment of a complaint is futile where the proposed amendment would fail to state a

claim upon which relief could be granted.[100]  "In assessing 'futility,' the . . . court applies the

same standard of legal sufficiency as applies under Rule 12(b)(6)."[101]  Just as it would be

dismissed under Rule 12(b)(6), an amendment to a complaint that is barred by a statute of

limitations is futile and should not be permitted.[102]  The Proposed Amended Complaint seeks to

avoid transfers under section 548 of the Bankruptcy Code and analogous state law.  Because

nearly four years have passed since the Initial Petition Date, certain of the New Transfers in the

Proposed Amended Complaint would be barred by statutes of limitations.[103]

---

[100] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1435 (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996)).

[101] *Id.*; *see also Garvin v. City of Philadelphia*, 354 F.3d 215, 222 (3d Cir. 2003) ("[A]ny amendment of her complaint would have been futile because the amended complaint could not have withstood a motion to dismiss on the basis of the statute of limitations.").

[102] *Garvin*, 354 F.3d at 222 ("Thus, if, as we shall conclude, the district court correctly held that the complaint would not relate back it surely did not abuse its discretion in denying the motion to amend.").  *But see Mullin*, 875 F.3d at 158 ("While courts are permitted to combine the question of whether amendment should be granted with the issue of whether the proposed amendment relates back, the two inquiries are analytically distinct; relation back is a test of the legal viability of the proposed amendment, and not a discretionary factor weighing in favor of or against amendment.") (internal citations omitted).  This Court first analyzes whether leave to amend would be appropriate under *Cureton*'s discretionary factors and then proceeds to the non-discretionary relation-back analysis, bearing in mind the following: While a negative finding on relation back would require the Court to deny leave to amend (solely with regard to the time barred claims), the converse is not necessarily true.  *See Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 553 (2010) ("The mandatory nature of the inquiry for relation back under Rule 15(c) is particularly striking in contrast to the inquiry under Rule 15(a), which sets forth the circumstances in which a party may amend its pleading before trial.").

[103] *See* Opp'n ¶¶ 28–37.

An amended claim that may otherwise be barred by the statute of limitations can be considered timely if it relates back to a timely filed complaint.[104]  Rule 15(c) "permits a party to file an otherwise untimely claim in an amended pleading where the claim related back to the party's original pleading in the action."[105]  Rule 15(c)(1)(B) provides that, "An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading . . . ."

"In essence, application of Rule 15(c) involves a search for a common core of operative facts in the two pleadings."[106]  The court considers "whether the opposing party has had fair notice of the general fact situation and legal theory upon which the amending party proceeds."[107]  "Rule 15(c) is not merely an 'identity of transaction test,' such as the rules governing joinder of claims or parties[,] . . ." despite containing language like Rule 20.[108]  Amendments "that significantly alter the nature of a proceeding by injecting new and unanticipated claims are treated far more cautiously."[109]

Rule 15(c)'s purpose is "to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits."[110]  Rule 15(c) should not be

---

[104] *Krupski*, 560 U.S. at 541.

[105] *Damiani v. Duffy*, Civ No. 12-1637-RGA, 2014 WL 5795683, at *5, 2014 U.S. Dist. LEXIS 156978, at *13 (D. Del. Nov. 5, 2014) (citing *Krupski*, 560 U.S. at 540).

[106] *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004).

[107] *T Mobile Ne. LLC v. City of Wilmington*, 913 F.3d 311, 328 (3d Cir. 2019) (quoting *Bensel*, 387 F.3d at 310).

[108] *Glover v. FDIC*, 698 F.3d 139, 145 (3d Cir. 2012) (citing 6A Charles Alan Wright, et al., Federal Practice & Procedure § 1497 (2d ed. 1990 and Supp. 2010)).

[109] *Id.* at 146 (quoting *United States v. Hicks*, 283 F.3d 380, 388 (D.C. Cir. 2002)) (internal  citations omitted); *see also T Mobile*, 913 F.3d at 328 (cautioning that when "[a]mendments . . . go beyond the mere correction or factual modification of the original pleading and significantly alter the claim or defense alleged in that pleading," courts should hesitate before granting leave to amend and carefully determine whether amendment is appropriate) (internal quotations omitted).

[110] *T Mobile*, 913 F.3d at 328 (quoting *Krupski*, 560 U.S. at 550) (internal quotations omitted).

read to undermine a statute of limitations, which "could cause defendants' liability to increase

geometrically and their defensive strategy to become far more complex long after the statute of

limitations had run."[111]  "Pleadings are not like magic tricks, where a plaintiff can hide a claim

with one hand, only to pull it from her hat with the other."[112]  Still, Rule 15(c) is not meant to

provide defendants who had notice of their potential liability with a windfall.[113]

Rule 15(c), unlike Rule 15(a), "does not leave the decision whether to grant relation back

to the . . . court's equitable discretion."[114]  While denying relation back under Rule 15(c) is

reason to find futility under *Cureton*, the equitable considerations of the Rule 15(a) analysis do

not relate to the enumerated conditions under Rule 15(c).[115]  For example, while undue delay is a

reason to deny leave to amend, it is not a reason to deny relation back.[116]

## A.    The Parties' Arguments About Relation Back and Futility

The Trustee argues that the Proposed Amended Complaint asserts claims that arise out of

the same conduct, transaction or occurrence as the Original Complaint and thus relate back.[117]

The Trustee makes two primary arguments in support of relation back.  First, the Trustee argues

that each interest payment and principal repayment are two parts of the same transaction; the

Trustee reasons that interest derives from principal and points out that, in this case, certain of the

wire transfers in the Original Table included both interest and principal.[118]  Second, the Trustee

---

[111] *Glover*, 698 F.3d at 148 (internal quotations omitted).

[112] *Id.*

[113] *See Krupski*, 560 U.S. at 550.

[114] *Id.* at 553.

[115] *See supra* note 102.

[116] *See Krupski*, 560 U.S. at 553 (observing that "the speed with which a plaintiff moves to amend her complaint or files an amended complaint after obtaining leave to do so has no bearing on whether the amended complaint relates back.") (internal citations omitted); *see also Arthur*, 434 F.3d at 203 (internal citations omitted) (noting that "The relation back inquiry is more circumscribed[,] . . ." than the leave-to-amend inquiry.).

[117] Mot. ¶ 26.

[118] Reply ¶ 26.

18

maintains that the Original Complaint sufficiently put the Defendant on notice of the general fact situation and legal theory of the case and that the Defendant would need to be prepared to defend potentially all aspects of his investment in the Woodbridge Ponzi Scheme. [119]

The Defendant argues that the New Transfers do not arise from the same conduct, transaction or occurrence as the Original Complaint.  In support of this position, the Defendant makes three arguments and attempts to analogize two decisions: a 1999 decision from the Bankruptcy Court for the Northern District of Georgia, *Gordon v. Slaughter*,[120] and this Court's 2004 decision of *In re MBC Greenhouse, Co.*[121]  First, the Defendant argues that the Original Complaint did not put him on notice that he might be liable for the New Transfers because the Original Complaint lacked a reservation of rights or similar language notifying him that he might be liable for "any later-discovered transfers."[122]  Second, the Defendant argues that the allegations purporting to establish his lack of good faith are not included in the Original Complaint and thus cannot relate back.[123]  Third, the Defendant argues that the Proposed Amended Complaint is so fundamentally different from the Original Complaint that allowing relation back would not align with the spirit of the same conduct, transaction or occurrence limitation of Rule 15(c).[124]

In *Gordon*, the Georgia bankruptcy court denied a plaintiff's motion to file a third amended complaint to plead additional fraudulent transfer claims arising from payments on a loan made to the defendant, the chapter 7 debtor's son, which were not discovered for over two

---

[119] Mot. ¶ 26.
[120] *Gordon v. Slaughter (In re Slaughter Co. & Assocs.)*, 242 B.R. 97 (Bankr. N.D. Ga. 1999).
[121] *Peltz v. CTC Direct, Inc. (In re MBC Greenhouse, Co.)*, 307 B.R. 787 (Bankr. D. Del. 2004).
[122] Opp'n ¶ 35.
[123] *Id.* ¶ 37.
[124] Tr. 51:9–21.

years following the filing of the initial complaint.[125]  Like *Gordon*, the Defendant argues, this Court should deny relation back because "the New Transfers are based on completely new facts and the New Transfers are never identified in the Complaint."[126]

In *MBC Greenhouse*, Judge Walsh declined to find relation back where an amended complaint sought to plead additional preferences, finding that the new claims were "a whole new set of specific transactions" and noting that there was "no claim that these payments are systematic or part of a 'scheme' . . . ."[127]  In *MBC Greenhouse*, the Defendant points out, Judge Walsh analogized the *Gordon* decision.[128]

Regarding *Gordon*, the Trustee replies that "the sole commonality between the transaction proposed to be added by the amended complaint and the transactions in the original complaint was merely that 'they all occurred during the year before the petition was filed.'"[129] And with regard to *MBC Greenhouse*, the Trustee highlights that "there was no commonalty between the proposed additional transfers and the existing transfers '[a]side from their characterization as preferential transfers and similar payees.'"[130]  These cases have, the Trustee asserts, "no import here, where the [P]roposed Amended Complaint merely expands the same challenges made in the Original Complaint to encompass both profits and principal repayment, rather than profits alone."[131]

---

[125] 242 B.R. at 99, 102–03.
[126] Opp'n ¶ 34.
[127] 307 B.R. at 792.
[128] Opp'n ¶ 33 (citing *MBC Greenhouse*, 307 B.R. at 790–93).
[129] Reply ¶ 23 (citing *Gordon*, 242 B.R. at 102).
[130] Reply ¶ 23 (first citing *Gordon*, 242 B.R. at 102; and then citing *MBC Greenhouse*, 307 B.R. at 793).
[131] Reply ¶ 24.

B.    <u>Amendment Would Not Be Futile Because the Amended Claims Relate Back</u>

*Gordon* and *MBC Greenhouse* are inapposite.  As the Trustee correctly notes, the

amended claims in *Gordon* and *MBC Greenhouse* did not arise from the same investments or

conduct as the initial claims.  In those cases, the only commonalities between the initial and

amended claims were the identities of the parties and the claims were close in time.  Indeed, in

*MBC Greenhouse*, Judge Walsh noted that there was no allegation that the amended claims and

original claims "are systematic or part of a 'scheme' . . . ."[132]  Those cases are markedly different

from the instant case where both the initial and amended claims arise from the Defendant's

investment in the Woodbridge Ponzi Scheme.

As to the Defendant's first argument, upon entry of the Confirmation Order containing

the Ponzi Scheme Finding, investors in Woodbridge were on notice that any prepetition

payments received from Woodbridge could have been made with fraudulent intent.  In addition,

the Debtors' prepetition payments to Mr. Halbert on account of his investment in Woodbridge

form the factual basis for both the Original Complaint and the Proposed Amended Complaint.

Even though the Trustee chose only to pursue fictitious profits in the Original Complaint,

because of his investment relationship and the Ponzi Scheme Finding, Mr. Halbert remained on

notice that any prepetition transfers, including receipt of principal, might also be subject to claw

back.  Accordingly, the Defendant had sufficient notice for relation back.

Although the Trustee's assertion that all the principal and interest payments arise from

precisely the same loans is a question of fact that may be disputed,[133] at this stage of the case the

Court must take the Trustee's allegations as true for the purpose of the futility analysis under

---

[132] *MBC Greenhouse, Co.*, 307 B.R. at 792.
[133] Tr. 39:10–25; 40:1–9.

*Cureton* because the Trustee would be the nonmovant if the Defendant moved to dismiss the amended claims. Principal repayments and interest payments on the same loans can be part of the same conduct, transaction or occurrence. Here, however, the receipt of payments is characterized very differently in the Original Complaint and the Proposed Amended Complaint. As acknowledged by the Trustee, Mr. Halbert's "apparent lack of good faith *fundamentally changes* the calculus of this Adversary Proceeding . . .'"[134] As a result of this fundamental change, Mr. Halbert's potential liability increased by nearly $37 million in the Proposed Amended Complaint. The fundamental change in the nature of the proceeding and magnitude of Mr. Halbert's potential amended liability gives pause.[135]

However, the uncontroverted exhibits to the Jeremiassen Declaration,[136] particularly Mr. Shapiro's signature on the Promissory Note, are a sufficient showing for purpose of Rule 15(c) that Mr. Halbert should have known of the fraud and thus had notice that the Original Complaint might be revised to claw back principal repayments. The Jeremiassen Declaration establishes that principal and interest payments arose from the same conduct, transaction or occurrence as that of the Original Complaint, namely Mr. Halbert's investment in the Woodbridge Ponzi Scheme.[137] The Court does not have discretion in applying Rule 15(c): The uncontroverted Jeremiassen Declaration, which was attached to both the Trustee's and the Defendant's pleadings, requires the Court to find, solely for purposes of this Motion, that the otherwise time-

---

[134] Mot. ¶ 6 (emphasis added).

[135] *See supra* note 109.

[136] Mr. Halbert attached the Jeremiassen Declaration and cites it for multiple propositions in his Opposition. Opp'n 2, ¶¶ 2, 19. Mr. Halbert did not contest the accuracy of the Jeremiassen Declaration or offer any competing evidence.

[137] *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 468 B.R. 620, 633 (Bankr. S.D.N.Y. 2012) (granting leave to amend and finding relation back for additional transfers, reasoning that the additional transfers being made as part of the same Ponzi scheme was sufficient common factual ground to provide the defendant with notice); *Adelphia Recovery Trust v. Bank of America, N.A.*, 624 F. Supp. 2d 292, 297, 334 (S.D.N.Y. 2009) (finding relation back for additional transfers on the basis that they were part of the same scheme of financial fraud as the original complaint.).

barred transfers identified in the Proposed Amended Complaint relate back to the transfers in the Original Complaint.

For these reasons, granting the Motion would not be futile.

<u>**Conclusion**</u>

For the reasons explained above, leave to amend will be granted.

Dated:  December 6, 2021

J. Kate Stickles
United States Bankruptcy Judge